In re MISSOURI PACIFIC RAILROAD COMPANY, d/b/a Union Pacific Railroad Company, Relator (Two Cases).

In re Southern Pacific Transportation Company & Missouri Pacific Railroad Company d/b/a Union Pacific Railroad Company, Relators.

In re Union Pacific Railroad Company, Relator.

Nos. 98–0841, 98–1131, 98–0842, 98–0843.

Supreme Court of Texas.

Argued March 4, 1999.

Decided July 1, 1999.

M. Karinne McCullough, Deborah A. Newman, Laura S. Favaloro, John L. Schouest, Doris A. Beutel, Houston, for Relator.

Gilbert T. Adams, Jr., Beaumont, Daryl L. Moore, Thomas Lee Ewing, Houston, Michael K. Nowak, Belleville, IL, E. Lauren Melton, Fort Worth, for Respondent.

Justice GONZALES delivered the opinion for a unanimous court.

These consolidated mandamus proceedings concern the mandatory venue statute[1] for suits brought under the Federal Employers' Liability Act (FELA).[2] In each case the key issue is whether the plaintiff in the underlying lawsuit sued the corporate defendant in a county where it maintains "a principal office," as defined in the venue statutes.[3] We conclude that the plaintiffs in all of the suits failed to prove that the corporate defendant has a principal office in the county of suit, so we direct the trial courts in Jefferson County[4] and Tarrant County[5] to transfer the cases to a proper county.

## I

These mandamus proceedings arise out of three FELA lawsuits filed in Jefferson County, and three filed in Tarrant County. Section 15.018(b) of the venue statutes gives three choices:

> (b) All suits brought under [FELA] shall be brought:
>
> (1) in the county in which all or a substantial part of the events or omissions giving rise to the claim occurred;
>
> (2) in the county where the defendant's principal office in this state is located; or
>
> (3) in the county where the plaintiff resided at the time the cause of action accrued.[6]

Subparts (b)(1) and (b)(3) do not apply here because none of the plaintiffs reside in the county of suit and none claim the cause of action arose there. All the plaintiffs in the Jefferson County cases claim damages for an injury occurring outside of Texas. Freddie Burleigh, a Louisiana resident, sued his employer, Missouri Pacific Railroad Company (Mo–Pac), for injuries he suffered in Louisiana. Terriance Spiller and Juanita Spiller, residents of Harris County, sued Mo–Pac for injuries Terriance Spiller received in Louisiana. Tamara L. Weston resides in Dalhart, Hartley County. She sued Southern Pacific Transportation Company and Mo–Pac in Jefferson County for an injury she suffered near Obar, New Mexico.

Each plaintiff in the Tarrant County suits against Union Pacific Railroad alleged he suffered an injury in his home state outside Texas. Ronald E. Smirl, a resident of Oklahoma, sued for an injury suffered in Chickasha, Oklahoma. Bobby Ray Martin, a Louisiana resident, sued for an incident occurring in Shreveport, Louisiana. Willie B. Williams is a resident of Arkansas who alleges an injury in Gurdon, Arkansas.

The venue challenges proceeded much the same in all the cases. The plaintiff alleged that the railroad maintained a principal office in the county of suit. The railroad denied that it had a principal office in the county of suit or that venue was proper there, and moved to transfer venue to Harris County where the railroad had principal offices in Texas. In each case the trial court denied the motion and retained venue, resulting in these mandamus proceedings.

## II

Section 15.0642 of the Texas Civil Practice and Remedies Code directs appellate courts to enforce the mandatory venue statutes by mandamus:

---

1. TEX. CIV. PRAC. & REM.CODE § 15.018.

2. 45 U.S.C. §§ 51–60.

3. See TEX. CIV. PRAC. & REM.CODE § 15.001(a).

4. In re Missouri Pac. R.R. Co., No. 98–0841 (Tex.1999); In re Missouri Pac. R.R. Co., No. Co., No. 98–0843 (Tex.1999).

5. In re Union Pac. R.R. Co., No. 98–1131 (Tex.1999).

6. TEX CIV. PRAC. & REM.CODE § 15.018(b)(1)–(3).

A party may apply for a writ of mandamus with an appellate court to enforce the mandatory venue provisions of this chapter. An application for the writ of mandamus must be filed before the later of:

> (1) the 90th day before the date the trial starts; or

> (2) the 10th day after the date the party receives notice of the trial setting.[7]

■ Section 15.0642 does not detail the scope of mandamus review of mandatory venue decisions. Traditionally, mandamus will not issue (1) unless the trial court has committed a clear abuse of discretion, (2) for which appeal is not an adequate remedy.[8] We determined in a prior case that the usual mandamus standard of review, abuse of discretion, applies to a section 15.0642 mandamus.[9] But we have not considered whether a party challenging a mandatory venue decision also must show that appeal is an inadequate remedy.[10] The railroads argue that it is presumed that there is no adequate remedy for a failure to enforce a mandatory venue statute, citing *KJ Eastwood Investments., Inc. v. Enlow.*[11] In that case, the court of appeals reasoned that it would undermine the purpose of section 15.0642 if a relator were forced to show inadequate remedy by appeal.[12] We agree.

We have repeatedly denied mandamus to review the merits of a venue decision because we considered it an incidental trial ruling correctable by appeal.[13] Before 1983, venue rulings were immediately correctable by interlocutory appeal under the former plea of privilege practice.[14] In 1983, the Legislature replaced interlocutory venue appeals with the rule that in an ordinary post-trial appeal, improper venue is not subject to harmless error analysis, virtually guaranteeing reversal.[15]

We have held that an appeal is inadequate to remedy an erroneous venue decision in only one instance—mandatory transfer in a suit involving the parent-child relationship.[16] In *Proffer v. Yates*, we reasoned that the need to expeditiously resolve custody and support issues makes ordinary appeal inadequate.[17] Outside of suits involving the parent-child relationship, our Court has steadfastly declined to review by mandamus whether venue was proper in the county of suit under the venue statutes.[18]

We reiterated in early 1995 that "Texas law is quite clear that venue determina-

7. TEX. CIV. PRAC. & REM.CODE § 15.0642.

8. See *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex.1992)

9. See *In re Continental Airlines, Inc.*, 988 S.W.2d 733, 735 (Tex.1998).

10. See id. at 736.

11. 923 S.W.2d 255 (Tex.App.—Fort Worth 1996, orig. proceeding).

12. See id. at 257–58. *Accord In re City of Dallas*, 977 S.W.2d 798, 803 (Tex.App.—Fort Worth 1998, orig. proceeding); *In re Missouri Pac. R.R. Co.*, 970 S.W.2d 47, 50 (Tex.App.—Tyler 1998, orig. proceeding).

13. See, e.g., *Bridgestone/Firestone, Inc. v. Thirteenth Court of Appeals*, 929 S.W.2d 440, 441 (Tex.1996); *Montalvo v. Fourth Court of Appeals*, 917 S.W.2d 1, 2 (Tex.1995); *Pope v. Ferguson*, 445 S.W.2d 950, 954 (Tex.1969).

14. See TEX.REV.CIV. STAT. art.2008, *repealed by* Act of June 17, 1983, 68th Leg., R.S., ch. 385, § 2, 1983 TEX. GEN. LAWS 2124.

15. See TEX. CIV. PRAC. & REM.CODE § 15.064.

16. See *Proffer v. Yates*, 734 S.W.2d 671, 673 (Tex.1987).

17. See id.

18. On rare occasion we have issued mandamus to correct improper venue procedure but not to review the propriety of venue in the county of suit. See, e.g., *In re Masonite*, 997 S.W.2d 194 (Tex.1999); *HCA Health Serv., Inc. v. Salinas*, 838 S.W.2d 246, 248 (Tex. 1992); *Union Carbide Corp. v. Moye*, 798 S.W.2d 792, 793 (Tex.1990); *Henderson v. O'Neill*, 797 S.W.2d 905, 905 (Tex.1990).

tions are not reviewable by mandamus."[19] But a few months later, the Legislature enacted section 15.0642 authorizing parties to seek mandamus "to enforce the mandatory venue provisions," along with a timetable for seeking mandamus.[20] The Legislature left in place the "presumed harm" rule for challenging venue in an appeal after trial.[21] Thus, section 15.0642 poses a conundrum: venue decisions are not reviewable by mandamus because they are correctable by appeal, but section 15.0642 authorizes mandamus review of mandatory venue decisions. Either the availability of mandamus relief under the statute is largely illusory, or we must dispense with the requirement of showing inadequate appellate remedy in mandatory venue cases.

■ Our goal in construing a statute is to carry out the Legislature's intent.[22] The language of section 15.0642 seems to contemplate a review of the merits of the trial court's decision on mandatory venue. Yet if we still insist on a particularized showing of inadequate remedy by appeal, then a court could rarely, if ever, "enforce the mandatory venue provisions" by mandamus. *Proffer* is the exception that illustrates the near-impossibility of showing that appeal is inadequate to remedy an erroneous venue decision. We do not lightly presume that the Legislature may have done a useless act.[23] Rather, we presume the Legislature intended "a result feasible of execution."[24] To effectuate the Legislature's intent, we conclude that adequacy of an appellate remedy is not a

requisite of a mandatory venue mandamus under section 15.0642.

### III

■ Thus, the focus of a mandamus proceeding under section 15.0642 is whether the trial court abused its discretion. The trial court has no discretion in determining the legal principles controlling its ruling or in applying the law to the facts.[25] A trial court does not have the discretion to make an erroneous legal conclusion even in an unsettled area of law.[26] Therefore, we review in these cases whether the trial courts failed to analyze or apply the law correctly when they refused to transfer the cases to the defendants' chosen venue.

■ The parties' pleading and proof limits a trial court's discretion to determine venue. A plaintiff's choice of venue stands unless challenged by proper motion to transfer venue.[27] Once challenged, the plaintiff has the burden to present prima facie proof by affidavit or other appropriate evidence that venue is maintainable in the county of suit.[28] The plaintiff's prima facie proof is not subject to rebuttal, cross-examination, impeachment, or disproof.[29] However, if the plaintiff fails to discharge the burden, the right to choose a proper venue passes to the defendant, who must then prove that venue is proper in the defendant's chosen county.[30] The controlling issue here is what the plaintiffs had to plead and prove to establish venue in "the county where the defendant's principal of-

19. *Polaris Inv. Mgmt. Corp. v. Abascal,* 892 S.W.2d 860, 862 (Tex.1995).

20. Tex. Civ. Prac. & Rem.Code § 15.0642.

21. *See id.* § 15.064.

22. *See Liberty Mut. Ins. Co. v. Garrison,* 966 S.W.2d 482, 484 (Tex.1998).

23. *See id.* at 485.

24. *See* Tex. Gov't Code § 311.021(4).

25. *See Walker,* 827 S.W.2d at 840.

26. *See Huie v. DeShazo,* 922 S.W.2d 920, 927–28 (Tex.1996).

27. *See* Tex.R. Civ. P. 86(1).

28. *See* Tex.R. Civ. P. 87(2)(a), (3)(a); *Wilson v. Texas Parks & Wildlife Dep't,* 886 S.W.2d 259, 260–61 (Tex.1994).

29. *See Ruiz v. Conoco, Inc.,* 868 S.W.2d 752, 757 (Tex.1993).

30. *See Tex.R. Civ. P.* 87(2)(a); *Masonite,* 997 S.W.2d at 197 n. 16; *Wilson,* 886 S.W.2d at 260 n. 1 (Tex.1994).

fice in this state is located" under the FELA venue statute.[31]

The railroads contend that a foreign corporation only has one principal office under the mandatory venue statutes for FELA actions. If the FELA venue statute is read in isolation, the provision for suit "in the county where the defendant's principal office in this state is located"[32] would indicate a company's Texas headquarters. However, that view is complicated by the general definition of "principal office" in section 15.001:

> In this chapter:
>
> (a) "Principal office" means a principal office of the corporation ... in this state in which the decision makers for the organization within this state conduct the daily affairs of the organization. The mere presence of an agency or representative does not establish a principal office.[33]

The plaintiffs respond that the phrase "a principal office" indicates that there can be more than one principal office. Further, the plaintiffs argue, the "daily affairs" of these defendants consist of operating trains, so that a principal office is wherever a railroad official makes decisions about operating trains.

We agree with the plaintiffs that a corporation can have more than one principal office. We are bound by the statutory definition of "principal office" as "a" principal office.[34] Thus, when we apply the general definition of "principal office" to the FELA venue statute, we must assume a

defendant company could have more than one principal office.

But we reject the plaintiffs' argument that the statute clearly defines a principal office as any place where a company official makes decisions about the company's business. Such a broad definition would include agencies and representatives, which the statute expressly rejects. Agencies and representatives, as we defined them under the former venue statutes, are officials who possess broad power and discretion to act for the corporation.[35] Thus, "decision makers" who "conduct the daily affairs" are officials of a different order than agents or representatives. Morever, even though "a principal office" suggests there can be more than one office, the term "principal" indicates some sort of primacy.[36] It is unlikely that an office clearly subordinate to and controlled by another Texas office could be "a principal office." Finally, in context, "the daily affairs" of a company cannot mean relatively common, low-level managerial decisions.

Beyond these preliminary observations, the statute is not entirely clear in all its particulars. The language of the statute could support more than one reasonable interpretation and therefore is ambiguous.[37] Because it is ambiguous, we may turn to extratextual sources such as the statute's legislative history.

## IV

Sections 15.001 and 15.018 codify parts of Senate Bill 32, enacted by the 74th Legislature.[38] The railroads contend that

---

31. *See* Tex. Civ. Prac. & Rem.Code § 15.018(b)(2).

32. *Id.*

33. *Id.* § 15.001(a).

34. *See* Tex. Gov't Code § 311.011(b); *Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 274 (Tex.1995).

35. *See Ruiz,* 868 S.W.2d at 759 (holding that oil company foreman lacked discretion and authority to constitute an agency or representative for venue purposes).

36. *See* Webster's Third New International Dictionary 1802 (1969) (defining the adjective "principal" as "most important, consequential, or influential: relegating comparable matters, items, or individuals to secondary rank").

37. *See San Antonio Gen. Drivers, Local No. 657 v. Thornton,* 156 Tex. 641, 299 S.W.2d 911, 914–15 (1957).

38. *See* Act of May 8, 1995, 74th Leg., R.S., ch 138, §§ 1–2 1995 Tex. Gen. Laws 978, 980.

Senate Bill 32's legislative history supports its interpretation of the venue statutes. The plaintiffs argue to the contrary, that the bill's history supports their own interpretation. Both the House and Senate proposed changes to the venue statutes for corporations during the 74th regular session of the Legislature, House Bill 6 and Senate Bill 32.[39] As the plaintiffs readily concede, and legislative history bears out, a major purpose of the 1995 amendments was to reduce or limit forum shopping.[40] As initially proposed, Senate Bill 32 did not define "principal office."[41] The Senate Committee on Economic Development added the definition of "a" principal office, but also provided that courts would determine a single county as the principal office in this state for any corporate defendant.[42]

The definition of "a principal office" remained in Senate Bill 32, but the provision for a single principal office was not included in the version the Senate adopted on April 19, 1995. The House substituted House Bill 6 with Senate Bill 32 and amended section 15.001(a) to provide that the mere presence of an agency or representative does not establish a principal office. The House passed Senate Bill 32 as amended on May 4, 1995, and the Senate concurred four days later.[43]

The railroads argue that the bill's history shows the Legislature intended to adopt the "nerve center" test to determine where a corporation has its principal office. This is the test federal courts use to decide a company's "principal place of business" for diversity jurisdictional purposes.[44] When he introduced the bill in a meeting of the Senate Economic Development Committee, the sponsor of the bill, Senator John T. Montford, mentioned the test when he described the definition of "a principal office":

> [A] definition of the term principal office has been added, [to] bring focus to [ ] one location that adopts the nerve center test, used by the federal courts, to determine what constitutes a principal office, instead of having a variety of possible constructions of where a principal office could be.[45]

The railroads read too much into Senator Montford's statement. The federal court that originated the term "nerve center test" stated the test thusly:

> [A company's] principal place of business is the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective.[46]

The nerve-center test focuses on where the activities of the corporation are controlled

39. See Tex. H.B. 6, 74th Leg., R.S. (1995) (sponsored by Representative Duncan); Tex. S.B. 32, 74th Leg., R.S. (1995) (sponsored by Senator Montford).

40. See, e.g., HOUSE RESEARCH ORGANIZATION, BILL ANALYSIS, Tex. S.B. 32, 75th Leg., R.S. (May 3, 1995); SENATE ECONOMIC DEVELOPMENT COMMITTEE REPORT (SUBSTITUTE)—BILL ANALYSIS, Tex. S.B. 32, 75th Leg., R.S. (April 12, 1995).

41. Tex. S.B. 32, 74th Leg., R.S. (1995)(introduced version).

42. Tex. S.B. 32, 74th Leg., R.S. (1995)(committee substitute, Committee on Economic Development).

43. See Act of May 8, 1995, 74th Leg., R.S., ch 138, §§ 1-2 1995 Tex. Gen. Laws 978, 982.

44. See 28 U.S.C. 1332(c)(stating that a corporation is a citizen of a state in which it maintains its principal place of business"); 13B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 3625 at 621 (2nd ed.1984) (stating nerve center test is one test used to determine corporate citizenship for diversity purposes).

45. Hearing on Tex. S.B. 32 Before Senate Comm. on Econ. Dev., 74th Leg., R.S. (April 11, 1995) (transcript available from Senate Staff Services Office).

46. Scot Typewriter Co. v. Underwood Corp., 170 F.Supp. 862, 864-65 (S.D.N.Y.1959).

or directed.[47] However, it is but one of several tests federal courts use to determine a corporation's principal place of business. Another is the "place of operations" or "corporate activity" test, which is where the bulk of the corporation's physical operations are located.[48] The Fifth Circuit uses either or both tests depending on the facts of the case.[49]

However, as the court of appeals for the Seventh Circuit notes, federal courts all agree that regardless of the test, a corporation has only one principal place of business for diversity purposes.[50] We agree with the plaintiffs that Senator Montford's reference in the committee meeting to the "nerve center test" signifies only a general approach, that a court should look at how a company is run rather than corporate activity or operations.

When Senate Bill 32 was presented on the floor of the Senate on April 19, 1995, Senator Teel Bivins moved to amend the bill by inserting the word "primary" before the phrase "decision makers." [51] The Senate passed Senate Bill 32 without the proposed amendment. The Jefferson County plaintiffs argue that rejection of this amendment indicates a legislative intent to reject a nerve center test that focuses on where only "serious" or "essential" business decisions are made. However, from the debates it appears that the principal concerns with Senator Bivins' proposed amendment were that Senate Bill 32 was the product of negotiations with members of the House and others, and that the proposed amendment would limit "principal office" to only one location.

The plaintiffs and the railroads cite to other statements and records from the history of Senate Bill 32 that are not particularly illuminating. However, a statement by Senator Montford on the floor of the Senate, and a similar statement by Representative Duncan on the floor of the House, made in the last debates before passage, provide some insight. Senator Montford explained the definition of "principal office" when he presented the bill on the floor of the Senate:

> [The definition of "principal office"] clarifies that in certain instances a business may have more than one principal office. It should apply to a very small number of businesses whose organizational structure is such that their presence in, perhaps two or three counties, is equally as strong, and thus they may have a principal office in each of those counties where they have a strong presence.[52]

Representative Duncan, the bill's sponsor in the House, made a similar statement on the third reading in the House, responding to questions by Representative Seidlits about the meaning of the definition.

> Seidlits: But ABC Company may have three principal offices in this state. One for North Texas, one for South, and one for West, and maybe one for East Texas. Is that right?
>
> Duncan: This was designed for those companies who may not necessarily have a central location where the decision makers are located, but may have three or four locations or four or five locations throughout the state where the decision makers are at an equal level.[53]

---

47. *See* 15 Moore, Moore's Federal Practice ¶ 102.54[2] (3 rd ed.1999).

48. *See Danjaq, S.A. v. Pathe Communications Corp.*, 979 F.2d 772, 776 (9 th Cir.1992).

49. *See Harris v. Black Clawson Co.*, 961 F.2d 547, 549 (5 th Cir.1992).

50. See *Metropolitan Life Ins. Co. v. Estate of Cammon*, 929 F.2d 1220, 1223 (7 th Cir. 1991).

51. *See* Debate on Tex. S.B. 32 on the Floor of the Senate, 74 th Leg., R.S. (April 19, 1995) (transcript available from Senate Staff Services Office).

52. *Id.*

53. Debate on Tex. S.B. 32 on the Floor of the House, 74 th Leg., R.S. (May 3, 1995) (tape available from Committee on House Administration)

We find nothing in the legislative history to dissuade us from our initial observations about the meaning of section 15.001. Rather, the legislative history supports our conclusion that: (1) a company may have more than one principal office, (2) the "decision makers" who conduct the "daily affairs" of the company are officials who run the company day to day, (3) a mere agent or representative is not a "decision maker" nor is a principal office one where only decisions typical of an agency or representative are made, and (4) a principal office is not an office clearly subordinate to and controlled by another Texas office.

The debates on the floor of the House and the Senate confirm that the Legislature did not intend to limit venue to only one county where the company maintains a corporate office if the facts do not warrant it. A company may control or direct its daily affairs in Texas through decision makers of substantially equal responsibility and authority in different offices in the state. In that case each office may be a principal office of the company.

Necessarily, courts must look at the corporation's structure to determine a company's principal office or offices. The titles of the company officials in a particular office are not as informative as a description of their responsibility and authority, relative to other company officials within the state. We recognize that our interpretation does not provide a precise test. But we believe the Legislature intended a flexible test to allow for the myriad forms that corporate structures can take.

## V

Turning to the facts of the Jefferson County cases, Burleigh and the Spillers contend that they were not required to prove a prima facie case because the defendants failed to specifically deny that the railroad had "decision makers and other management personnel," in Jefferson County as required by Texas Rule of Procedure 87(3)(a).[54] However, the railroads denied that they had a principal office in Jefferson County and enumerated the officers in Harris County versus those in Jefferson County. Thus the plaintiffs were required to present prima facie evidence that venue was proper in Jefferson County.

The plaintiffs' evidence focused largely on the extent of operations and equipment in Jefferson County, Texas. The evidence showed that the railroad's corporate headquarters were in Omaha, Nebraska, and many of the executive and administrative decisions were made there. The evidence did little to define the role of any of the decision makers in Jefferson County relative to the rest of the company in Texas. A party cannot prove a prima facie case that a county has a principal office without evidence of the corporate structure and the authority of the officers in the county of suit as compared with the remainder of the state. The only company officials in Jefferson County the plaintiffs' evidence identified were a manager of train operations, a manager of yard operations, and a "maintenance and way" foreman. There was testimony that the railroads' corporate headquarters delegated some policy-making to the local level. However, there is little evidence of the kinds of decisions the Jefferson County officials could make. More importantly, there is no evidence of how the Jefferson County officials' authority compared to others statewide, so that the court could make a meaningful determination whether Jefferson County is in any sense a "principal office."

## VI

The Tarrant County plaintiffs put on more extensive evidence of Union Pacific's organization structure in Texas. Union Pacific is divided into four regions. The southern region includes most of Texas and parts of Louisiana. The southern

54. *See GeoChem Tech Corp. v. Verseckes,* 962 S.W.2d 541, 543 (Tex.1998).

region is further divided into six divisions. In answer to interrogatories, the railroad identified the "decision makers" who office in Harris County as a general solicitor, a vice president for transportation, a general manager, two general supervisors, a chief engineer, and two division superintendents. All but the division superintendents are considered executive officers of the company. The former general solicitor stated in a deposition that "the real policy decisions and real serious operational decisions are made by persons at the level of superintendent or above." The only official the plaintiffs claim is a "decision maker" in Tarrant County is a division superintendent for the Fort Worth service unit. He testified in his deposition that his duties included coordinating the movement of trains, staffing the crews within the area, and ensuring rules compliance and discipline. The division superintendent also said that the southern region is based in Houston, and his boss is the general manager in Harris County.

This evidence is sufficient to characterize a division superintendent as a decision maker under the statute. However, it fails to establish prima facie that the Tarrant County office is a principal office when compared to the responsibility and authority exercised by company officials elsewhere in Texas. The evidence shows that the division superintendent in Tarrant County is not an executive officer and has the least authority of any of the decision makers with any real discretion or authority. In contrast, there are six executive officers in Harris County. The two highest ranking officers in Texas, general solicitors, conduct the affairs of the railroad from offices in Harris County. They oversee legal affairs such as FELA litigation in Texas for the railroads. The general manager of transportation is responsible for the transportation plan for the southern region of the Company, which includes Texas and Louisiana. The general manager supervises the assistant general manager and the general superintendent. The

general supervisor also supervises six division superintendents, two in Houston, three in other Texas offices, and one in Louisiana. The general superintendent performs the logistics for deciding train starts and yard starts. Finally, the chief engineer directs the activities of local maintenance-of-way and signal service units throughout the region.

## VII

The plaintiffs failed to establish Jefferson County or Tarrant County as principal offices of the railroads. The burden shifted to the defendants to prove that Harris County is a proper venue. The venue facts bear out that Harris County is "a" principal office of the railroads, and therefore a proper venue under the mandatory FELA statute. The trial courts abused their discretion by not sustaining the motions to transfer. Accordingly, we conditionally issue writs of mandamus directing the trial courts to sustain the railroads' motions to transfer the cases to Harris County. The writs will not issue unless the trial courts fail to act in accordance with this opinion.