IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF 
TEXAS
 
════════════
No. 
03-1151
════════════
 
In re 
Texas Association of School Boards, Inc. and Texas Association of School 
Boards Risk Management Fund, Relators
 
 
════════════════════════════════════════════════════
On Petition for Writ of 
Mandamus
════════════════════════════════════════════════════
 
 
Argued September 30, 2004
 
 
Justice Owen delivered the opinion of 
the Court.
 
Justice Green and Justice Johnson did not participate in 
the decision.
 
 
In 
this mandamus proceeding, the Texas Association of School Boards, Inc. and the 
Texas Association of School Boards Risk Management Fund seek to have a suit 
against them transferred from Duval 
County to 
Travis 
County based on a contractual choice 
of venue provision in a risk coverage agreement that is similar to an insurance 
contract.  They assert that the 
agreement is a “major transaction” within the meaning of section 15.020 of the 
Civil Practice and Remedies Code.[1]  Section 15.020 is a mandatory venue 
provision.  If there is a written 
agreement that suit arising from a “major transaction” may be brought in a 
particular county, suit must be brought in that county.[2]  A “major transaction” is “a transaction 
evidenced by a written agreement under which a person pays or receives, or is 
obligated to pay or entitled to receive, consideration with an aggregate stated 
value equal to or greater than $1 million.”[3]  The relators 
agreed to provide more than $17 million in risk coverage at a cost of $41,973 
per year.  The trial court declined 
to enforce the parties’ venue agreement without stating its reasons, and the 
court of appeals denied mandamus relief.[4]  We likewise deny mandamus relief.  The mandatory venue provision in section 
15.020 is inapplicable because the coverage agreement is not a “major 
transaction.”[5]
I
The 
Texas Association of School Boards Risk Management Fund (the Fund) is a 
nonprofit, statewide administrative agency consisting of cooperating public 
school districts in Texas.  The Fund offers self-funded liability 
coverage plans to education-based political subdivisions.  The Texas Association of School Boards 
(TASB) is the Fund’s servicing contractor and provides services including the 
investigation and handling of property loss claims. 
In 
October 2000, Benavides Independent School District (BISD) and the Fund entered 
into an “Interlocal Participation Agreement” under 
which the Fund agreed to provide vehicle and general liability coverage as well 
as coverage for certain casualty losses to property in return for an annual 
contribution from BISD.  The term of 
the agreement was for one year, automatically renewable for two successive 
one-year terms, with the coverage and contribution amounts adjusted 
annually.
The 
coverage was renewed for the first renewal term, and during that term, coverage 
for potential losses or liabilities was in excess of $17,000,000 for an annual 
contribution of $41,973.[6]  In their briefing in this Court, the 
parties have segregated the annual amount paid for coverage of up to $15,309,822 
for casualty loss to buildings, personal property, and auxiliary structures 
B 
$33,069 C 
from the annual amount paid for all other coverage C 
$8,904.
This 
suit arises from BISD’s claim for indemnity under the 
parties’ agreement for water damage and other alleged physical losses to every 
building in its school district, totaling more than $17 million.  TASB denied the claim, and BISD appealed 
to the Fund’s Board of Trustees, which affirmed the denial.  BISD then sued the Fund and TASB in 
Duval 
County, asserting claims for breach 
of contract, declaratory relief, deceptive trade practices, unconscionable 
conduct, negligence, gross negligence, and breach of an alleged duty of good 
faith and fair dealing.  BISD 
subsequently joined two other defendants, alleging negligence against Roofology Consultants Corp., which provided roofing 
consultation to BISD for some of the buildings at issue, and alleging tortious interference and civil conspiracy against Pro-Staff 
Adjusting Services, which investigated BISD’s claims 
on behalf of the Fund and TASB.
The 
Fund and TASB filed a motion to transfer venue to 
Travis 
County based on a venue provision in 
the coverage agreement, which states “[t]his agreement shall be governed by and 
construed in accordance with the laws of the State of 
Texas, and venue shall lie in 
Travis County, Texas, unless otherwise mandated by law.”  The Fund and TASB contend that venue is 
mandatory in Travis 
County pursuant to section 15.020 of 
the Texas Civil Practice and Remedies Code because, they assert, the agreement 
with BISD is a “major transaction.”  
That term is defined in section 15.020: 
 
“major 
transaction” means a transaction evidenced by a written agreement under which a 
person pays or receives, or is obligated to pay or entitled to receive, 
consideration with an aggregate stated value equal to or greater than $1 million 
. . . [not including] a transaction entered into primarily for 
personal, family, or household purposes, or to settle a personal injury or 
wrongful death claim, without regard to the aggregate value.[7]
 
The 
Fund and TASB contend that the aggregate stated value of the consideration for 
the coverage agreement is BISD’s annual contribution 
plus the coverage limits under the agreement, which would exceed section 
15.020’s $1 million threshold.  
BISD counters that the consideration is only BISD’s $33,069 annual contribution for property casualty 
loss coverage.  Alternatively, BISD 
asserts that (1) the choice of venue provision is unenforceable because the 
coverage agreement is unconscionable,[8] 
(2) its claim is for damage to real property and therefore venue in 
Duval 
County is mandatory under section 
15.011,[9] 
or (3) if both sections 15.020 and 15.011 are mandatory, BISD’s choice of venue must be given effect.
The 
trial court denied the Fund and TASB’s motion to 
transfer venue without stating its reasons, and the court of appeals summarily 
denied the Fund and TASB’s petition for writ of 
mandamus.[10]  Because our conclusion that section 
15.020 does not apply to the coverage agreement is dispositive of the request for mandamus relief, we do not 
reach the other issues raised by the parties.
II
If 
a trial court erroneously denies enforcement of a mandatory venue provision, 
mandamus relief is available without the necessity of showing an inadequate 
appellate remedy.[11]  Because trial courts have no discretion 
in determining the legal principles controlling their rulings or in applying the 
law to the facts, our focus in this case is whether the trial court failed to 
correctly apply section 15.020.[12]
Construction 
of section 15.020 is an issue of first impression for this Court.  That section provides in its 
entirety:
 
§ 
15.020. Major Transactions:  
Specification of Venue by Agreement
 
(a) 
In this section, “major transaction” means a transaction evidenced by a written 
agreement under which a person pays or receives, or is obligated to pay or 
entitled to receive, consideration with an aggregate stated value equal to or 
greater than $1 million.  The term 
does not include a transaction entered into primarily for personal, family, or 
household purposes, or to settle a personal injury or wrongful death claim, 
without regard to the aggregate value.
 
(b) 
An action arising from a major transaction shall be brought in a county if the 
party against whom the action is brought has agreed in writing that a suit 
arising from the transaction may be brought in that county.
 
(c) 
Notwithstanding any other provision of this title, an action arising from a 
major transaction may not be brought in a county if:
 
(1) 
the party bringing the action has agreed in writing that an action arising from 
the transaction may not be brought in that county, and the action may be brought 
in another county of this state or in another jurisdiction; or
 
(2) 
the party bringing the action has agreed in writing that an action arising from 
the transaction must be brought in another county of this state or in another 
jurisdiction, and the action may be brought in that other county, under this 
section or otherwise, or in that other jurisdiction.
 
(d) 
This section does not apply to an action if:
 
(1) 
the agreement described by this section was unconscionable at the time that it 
was made;
 
(2) 
the agreement regarding venue is voidable under 
Section 35.52, Business & Commerce Code; or
 
(3) 
venue is established under a statute of this state other than this title.
 
(e) 
This section does not affect venue and jurisdiction in an action arising from a 
transaction that is not a major transaction.[13]
 
The 
principal dispute in this case is what constitutes the “aggregate stated value” 
of the “consideration” “which a person pays or receives, or is obligated to pay 
or entitled to receive” under the parties’ agreement.[14]  We have examined the legislative 
history, and it is silent as to what the Legislature intended on this 
score.  However, the legal concept 
of “consideration” is well-established, although difficult to distill into a 
short, concise definition that fits all formations of contracts.[15]
What 
is clear is that the consideration for an agreement like the one between the 
Fund and BISD is an exchange of promises.[16]  The Fund promised to pay any claims that 
were covered, up to the coverage limits, if, as, and when they occurred during 
the specified term.  BISD promised 
to pay $41,973 for this coverage.  
Although the parties have looked only at the contribution for property 
damage coverage, which was $33,069, the statute contemplates that the 
“aggregate” stated value of the consideration a person pays or is obligated to 
pay is the determinant amount.  The 
aggregate amount BISD agreed to pay under its written agreement with the Fund 
was $41,973.  The “aggregate stated 
value” of BISD’s promise to pay is thus easily 
determinable.
The 
dispute, however, is over the “aggregate stated value” of the Fund’s 
promise.  The Fund contends that 
this should be measured by the coverage limits.  We disagree.  The consideration the Fund furnished was 
its agreement to bear the risk that covered losses might occur.  The value assigned in the coverage 
agreement to the risk the Fund assumed is the $41,973 annual contribution from 
BISD. 
An 
insurance agreement, like the coverage agreement at issue in this case, is an 
aleatory contract; that is, a contract in which a 
promise is conditioned on the happening of a fortuitous event, an event of 
chance.[17]  “The payment of the premium by the 
insured and the assumption of a specified risk by the insurer are the essential 
elements of the contract of insurance.  
The payment . . . [of] premiums is the consideration for 
which the insurer agrees to assume the risk specified in the policy.”[18]  In an insurance arrangement,
 
the 
insurer is not promising to compensate the insured for an actual, expensive loss 
in exchange for the relatively small, individual premium paid by the 
insured.  Rather, the insurer is 
assuming the risk that death or property loss may occur in exchange for 
the premium payment.  Moreover, the 
parties contemplate that the insured will perform his promise to pay premiums 
even though the condition to the duty of the insured never occurs.  A life insurance contract in the amount 
of a million dollars must be performed though the insured is struck by lightning 
and dies after paying only one relatively small premium.  Similarly, a homeowner who has paid fire 
insurance premiums for a lifetime cannot reclaim those premiums because no fire 
occurred.  In fact, both parties 
hope that the condition will never occur.[19]
 
“It 
is characteristic of insurance that a number of risks are accepted, some of 
which involve losses, and that such losses are spread over all the risks so as 
to enable the insurer to accept each risk at a slight fraction of the possible 
liability upon it.”[20]  The foundation of insurance is therefore 
risk distribution,[21] 
and premiums are a function of calculated risk.  As a result, there is no premium due 
until risk attaches, and once risk has attached premiums have been earned and 
are non-returnable, absent a statutory or contract provision to the contrary.[22]  Similarly, if risk has never attached 
because an insurance policy was void ab initio, the insured is entitled to a return of all premiums 
paid.[23]  Thus, the consideration to be valued is 
the undertaking of the risk that insured losses might occur.
BISD 
agreed to pay what is in essence a premium of $41,973.  That is the value the parties assigned 
to the risks the Fund assumed.  In 
setting the contribution or premium amount, TASB’s 
underwriting department considered BISD’s loss ratio 
for the preceding three years, the territory, the protection class and the 
location.  The aggregate stated 
value of the consideration for the coverage agreement is the amount of the 
contribution specified in the agreement for assumption of the risk of loss from 
the enumerated perils, not the coverage limits.
The 
Fund and TASB argue that this Court held in Mid-Century Insurance Co. of 
Texas v. Kidd[24] 
that insurance policy coverage limits are the consideration an insurer gives in 
exchange for premium payments.  In Kidd, the issue was whether 
an insurer was entitled to enforce a contractual provision in an 
uninsured/underinsured motorist (UM/UIM) policy, requiring any damages paid 
under that policy to be offset by the amount of any benefits paid to the insured 
under a personal‑injury‑protection (PIP) policy.[25]  We held that the insurer was entitled to 
an offset in order to prevent recoveries in excess of actual damages.[26]  In addressing an argument that allowing 
an offset would result in a failure of the consideration exchanged for the 
insured’s PIP premiums, we said:
 
UM/UIM 
and PIP coverages are complementary and indemnify 
insureds against different risks.  UM/UIM coverage indemnifies insureds against only those damages proximately caused by 
the other driver’s negligence.  PIP 
coverage, by contrast, also covers damages attributable to the insured’s own 
negligence.  Also, the policy’s 
UM/UIM and PIP limits may be aggregated to the extent needed to compensate 
actual damages.  In sum PIP provides 
protection that UM/UIM does not.  
This additional coverage is consideration for the PIP premiums 
paid.[27]
 
The 
emphasized sentence correctly recognized that the agreement to provide PIP 
coverage of up to a certain amount for the insured was consideration for 
the additional amount of premium paid.  
The promise to indemnify an insured if an injury occurs is the 
consideration for the premiums paid.
* * * *
We 
conclude that the trial court did not err in refusing to enforce the contractual 
choice of venue provision under section 15.020 of the Civil Practice and 
Remedies Code.  Accordingly, the 
petition for writ of mandamus is denied.
 
 
 
 
__________________________________________
Priscilla 
R. Owen
Justice
 
 
OPINION 
DELIVERED:  May 13, 2005




[1] Tex. 
Civ. 
Prac. & Rem. Code ' 15.020.

[2] Id. § 15.020(b).

[3] Id. § 15.020(a).

[4] In re Tex. Ass’n of Sch. Bds., Inc., ___ S.W.3d 
___ (Tex. App.BSan Antonio 2003, orig. proceeding) (per curiam).

[5] Tex. 
Civ. 
Prac. & Rem. Code 
§ 15.020(a).

[6] The agreement provided for “$15,309,822 Blanket 
Replacement Cost Limit on Buildings, Personal Property and Auxiliary Structures” 
for a contribution of $33,069; “General Liability” including “Personal Injury 
and Employee Benefits Liability” with a $1,000,000 per occurrence limit for a 
contribution of $825; “School Professional Legal Liability” with a $1,000,000 
annual aggregate limit for a contribution of $3,964; “Vehicle Coverage” “Fleet 
Liability” with $100,000 per person and $300,000 per occurrence limits for 
bodily injury and $100,000 property damage limits, for a contribution of $2,286; 
“Vehicle Coverage” “Physical Damage - Actual Cash Value” “Private Passenger” 
“Comprehensive” for a contribution of $129 and “Collision” for a contribution of 
$483; “Vehicle Coverage” “Physical Damage - Actual Cash Value” “All other 
vehicles (Buses, Trucks, Trailers and Vans)” “Specified Perils” for a 
contribution of $509 and “Collision” for a contribution of 
$708.

[7] Id.

[8] See id. § 15.020(d)(1) (“[Section 15.020] 
does not apply to an action if:  
(1) the agreement described by this section was unconscionable at 
the time that it was made.”).

[9] See id. § 15.011 (“Actions for recovery of 
real property or an estate or interest in real property, for partition of real 
property, to remove encumbrances from the title to real property, for recovery 
of damages to real property, or to quiet title to real property shall be brought 
in the county in which all or a part of the property is 
located.”).

[10] In re Tex. Ass’n of Sch. Bds., Inc., ___ S.W.3d 
___ (Tex. App.BSan Antonio 2003, orig. proceeding) (per curiam).

[11] Tex. 
Civ. 
Prac. & Rem. Code 
§ 15.0642 (authorizing application for 
a writ of mandamus to enforce mandatory venue provisions); see also In re Mo. 
Pac. R.R. Co., 998 S.W.2d 212, 216 (Tex. 1999) (inadequate appellate remedy is not a 
prerequisite to mandamus relief under Tex. 
Civ. 
Prac. & Rem. Code 
§ 15.0642).

[12] See In re Mo. Pac. R.R. Co., 998 S.W.2d 
at 216.

[13] Tex. 
Civ. 
Prac. & Rem. Code 
§ 15.020.

[14] Id. § 15.020(a).

[15] See, e.g., Lord, Williston on Contracts, 
§ 7:2, at 18‑20, § 7:4, at 36‑41, 47 (4th ed. 1992).  Sections 7:2 and 7:4 
provide:
 
[A] third underlying basis for the enforcement of 
promises is the notion of a bargained-for exchange, and the meaning of 
consideration here is the idea that the consideration is the exchange or price 
requested and received by the promisor for his 
promise.  Today, this notion 
represents the fundamental and generally accepted idea of consideration, and it 
is in this sense that the word is used in this treatise.
 
* * *
 
It is often stated that the consideration required to 
support a promise is a detriment incurred by the promisee or a benefit received by the promisor at his request.  Both the drafters of the First 
Restatement and more explicitly the Second Restatement, [sic] assert that 
neither a benefit nor a detriment is necessary and that all that is required is 
a bargained-for exchange.  However, 
the case law on the subject belies that assertion, the courts in general 
insisting that either a detriment incurred by the promisee or a benefit received by the promisor at the request of the promisor exist before consideration will be found. 

 
Both benefit and detriment in this context have a 
technical meaning.  Neither the 
benefit to the promisor nor the detriment to the promisee need be actual; rather, it is a sufficient 
legal detriment to the promisee if he promises 
or performs any act, regardless of how slight or inconvenient, which he is not 
obligated to promise or perform so long as he does so at the request of the 
promisor and in exchange for the promise. 
. . .
* * *
By the same token, the term benefit means the receiving 
as the exchange for a promise some performance or forbearance which the promisor was not previously entitled to receive.  That the promisor desired it for his own advantage and had no 
previous right to it is enough to show that it was 
beneficial.
 
Id. (citations omitted).

[16] See id.; see also Restatement (Second) of Contracts § 71 (1981) 
(explaining the need for a bargained-for exchange of promises or 
performance).  Section 71 of the 
Restatement 
provides:
 
§ 71 Requirement of Exchange; Types of Exchange(1) To 
constitute consideration, a performance or a return promise must be bargained 
for.
(2) A performance or return promise is bargained for if 
it is sought by the promisor in exchange for his 
promise and is given by the promisee in exchange for 
that promise.
(3) The performance may consist of      (a) an act other 
than a promise, or(b) a forbearance, or(c) the creation, modification, or 
destruction of a legal relation.
 
(4) The performance or return promise may be given to 
the promisor or to some other person.  It may be given by the promisee or by some other person.
 
Restatement (Second) of 
Contracts § 71 
(1981).

[17] Murray, 
Murray on Contracts ' 98(G), at 590, § 105(C), at 663 (4th ed. 
2001).

[18] Couch on 
Insurance 3d § 69:2 (1996) (citations 
omitted).

[19] Murray on 
Contracts § 105(C), at 663 (citations 
omitted).

[20] 1 Couch, 
Cyclopedia of Insurance Law 
§ 1.3 (2d ed. 1959).

[21] Holmes 
et al., Holmes’s Appleman on Insurance, 2d 
§ 1.2, at 3-4 (1996) (“At its core essence, risk is the Mother Mold of 
Insurance. . . . In a superficial way, insurance is generally 
understood as risk sharing through consensual arrangements which transfer and 
distribute risks among the consenting parties.”); see also Keeton et al., Insurance Law §§ 1.2, 1.3 (1988) 
(observing that insurance is an arrangement for transferring and distributing 
risk).

[22] Holmes, 
Holmes’ Appleman on Insurance 2d 
§ 33.8, at 611-12 (1998); see also Rosenstock 
v. Wheeler, 310 S.W.2d 350, 353 (Tex. Civ. 
App.BHouston 1958, writ ref’d) (“A 
premium is the consideration paid by a person for insurance protection or 
coverage.  When the policy of 
insurance is cancelled, he is without coverage and he is entitled to a refund of 
the consideration he has paid for the coverage for the period of time the 
coverage was not in force.”).

[23] See Am. Nat’l Ins. Co. v. Smith, 13 S.W.2d 720, 
723 (Tex. Civ. App.BEl Paso 1929, writ ref’d) 
(“‘[P]remiums paid upon a void policy of insurance may 
be recovered because “the underwriter receives a premium for running the risk of 
indemnifying the insured, and whatever cause it may be owing to, if he does not 
run the risk the consideration for which the premium or money was paid into his 
hands fails, and therefore he ought to return it.”‘“ (quoting Metro. Life 
Ins. Co. v. Felix, 75 N.E. 941, 942 (Ohio 1905))).

[24] 997 S.W.2d 265 (Tex. 1999).

[25] Id. at 267.

[26] Id. at 277.

[27] Id. at 275 (emphasis added and citation 
omitted).