**GRAMERCY INSURANCE
CO., Appellant,**

v.

**MRD INVESTMENTS, INC., Appellee.**

No. 14–99–01242–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

May 3, 2001.

William O. Holston Jr., Houston, for appellants.

William M. Thursland, Houston, for appellees.

Panel consists of Justices WITTIG, FROST, and MAURICE AMIDEI.*

## OPINION

FROST, Justice.

Appellant, Gramercy Insurance Company, a surety on a motor vehicle dealer's surety bond, challenges the trial court's

* Former Justice Maurice Amidei sitting by as-

signment.

rulings on cross-motions for summary judgment in a suit to collect under the bond. The trial court granted summary judgment in favor of appellee, MRD Investments, Inc., the bond claimant. We reverse and render judgment in favor of Gramercy.

## I. FACTUAL BACKGROUND

The pertinent facts in this case are undisputed. Rebecca Reid operated a used car business known as "Fine Motor Cars of Houston." MRD contracted with Reid to provide floor plan financing for Reid's purchase of motor vehicles.

As a dealer of motor vehicles in Texas, Reid was obligated under the Transportation Code to obtain a $25,000 surety bond conditioned on her payment "of all valid bank drafts, including checks, drawn by the applicant [Reid] to buy motor vehicles...." TEX. TRANS.CODE ANN. § 503.033(a), (b)(2)(A) (Vernon 1999).[1] Gramercy issued a motor vehicle dealer's surety bond, with Reid as the principal and Gramercy as the surety. The bond was effective through the end of September 1997.

In the summer of 1997, Reid issued a sight draft in the amount of $5,500, to Don McGill Imports, drawn on MRD's account at Houston Community Bank. The face of this draft indicated it was in payment for a "1988 BMW 735i." Reid issued a second sight draft, in the amount of $23,000, to Intercontinental BMW. This draft, also drawn on MRD's account at Houston Community Bank, indicated it was in payment for a "1993 BMW 740i." Both of these

drafts were paid upon presentment. MRD took possession of the certificates of title to the two automobiles described in the drafts.

A few weeks after issuing the second draft, Reid wrote a check payable to MRD for $23,000. The memo line of the check indicated it was for a "93–740i." At about the same time, Reid wrote a second check payable to MRD for $5,500. The face of this check indicated that it was for an "88 BMW 735i." When Reid tendered the two checks for the draft amounts to MRD, MRD released the certificates of title to the automobiles to Reid. Shortly thereafter, both of Reid's checks were returned to MRD marked "unpaid due to insufficient funds."·

MRD brought suit against Reid, individually and d/b/a Fine Motor Cars of Houston, to recover the aggregate amount of the returned checks ($28,500), plus interest and attorney's fees. In its suit against Reid, MRD claimed it was the owner of the two vehicles identified on the drafts and that it had sold these vehicles to Reid for $23,000 and $5,500, respectively. Asserting that the checks Reid tendered were later dishonored for insufficient funds, MRD sought to recover on claims for conversion and breach of contract. The trial court granted MRD's opposed motion for summary judgment in the MRD/Reid lawsuit and entered judgment against Reid for $31,736.00.

A short time later, MRD made a demand upon Reid's surety, Gramercy, to pay under the motor vehicle dealer's sure-

---

1. "A person may not engage in business as a dealer, directly or indirectly, including by consignment, without a dealer general distinguishing number in one of the six categories described by Section 503.029(a)(6) for each location from which the person conducts business as a dealer." TEX. TRANS. CODE ANN. § 503.021 (Vernon 1999). Section 503.033(a) further provides that the "department may not issue or renew a motor vehicle dealer general distinguishing number or a wholesale motor vehicle auction general distinguishing number unless the applicant provides .... (1) satisfactory proof that the applicant has purchased a properly executed surety bond in the amount of $25,000...." § 503.033.

ty bond. MRD claimed Reid had breached the bond condition by failing to pay checks she drew and tendered to MRD for the purchase of motor vehicles. Gramercy refused to pay, asserting that Reid had not violated the bond condition because the checks she tendered to MRD were pursuant to a floor plan financing agreement between Reid and MRD and, therefore, were not tendered to purchase the vehicles. MRD brought this suit against Gramercy to recover on its bond claim. Both parties moved for summary judgment. The trial court granted summary judgment for MRD, awarding $25,000 (the amount of the bond), pre-judgment interest, and attorney's fees.

## II. ISSUES PRESENTED FOR REVIEW

Gramercy challenges the trial court's denial of its motion for summary judgment and the summary judgment rendered for MRD by raising six issues for appellate review. In its first three issues, Gramercy asks (1) whether the condition of a surety bond issued under section 503.033 of the Transportation Code requires that a check, on which a bond claim is based, be given to "buy a motor vehicle," (2) whether a floor plan financing arrangement falls within the scope of a surety bond issued under section 503.033; and (3) whether a surety issuing a bond under section 503.033 is liable for the dishonor of checks given by the principal/dealer to repay a loan, where the principal/dealer used the loan proceeds to purchase two BMW vehicles. In its fourth and fifth points of error, Gramercy, focusing on the underlying litigation between MRD and Reid, asks (1) whether the trial court may review the pleadings, facts, and circumstances in the MRD/Reid lawsuit to determine whether Gramercy is liable as surety under the bond and (2) whether the trial court erred in failing to examine the facts underlying the MRD/Reid lawsuit and in determining that the

bond was implicated in that suit. Finally, in its sixth point, Gramercy claims the trial court erred in granting summary judgment for MRD and in denying Gramercy's motion for summary judgment.

## III. STANDARD OF REVIEW

The standards for reviewing a summary judgment are well established. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law. *Id.* The reviewing court must accept all proper summary judgment evidence favorable to the non-movant as true. *Id.* at 548–49. In addition, the court must indulge every reasonable inference in favor of the non-movant and resolve all doubts in its favor. *Id.* at 549.

Where, as here, the parties have filed competing motions for summary judgment, and one motion is granted while the other is denied, an appellate court may consider the propriety of the grant as well as the denial. *Comm'rs Court v. Agan*, 940 S.W.2d 77, 81 (Tex.1997). If the issue raised is based upon undisputed and unambiguous facts, then the reviewing court may determine the question presented as a matter of law. *McCreight v. City of Cleburne*, 940 S.W.2d 285, 288 (Tex.App.—Waco 1997, writ denied). In this situation, the court may either affirm the judgment or reverse and render the judgment the trial court should have rendered, including one that denies both motions. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988). However, if resolution of the issues rests on disputed facts, summary judgment is inappropriate, and the reviewing court should reverse and remand for further proceedings. *Coker v. Coker*, 650 S.W.2d 391, 394–95 (Tex.1983).

## IV. Scope and Breach of Bond Condition on Motor Vehicle Dealer's Surety Bond

■ We begin the analysis by noting that violation of the bond condition is a predicate to the surety's liability and the claimant's recovery on a motor vehicle dealer's surety bond. *See* Tex. Trans. Code Ann. § 503.033(b)(2)(A) (Vernon 1999). Gramercy contends that there was no violation because Reid did not purchase the vehicles from MRD but instead gave the checks as payment for the floor plan financing MRD provided under its agreement with Reid. Gramercy maintains that to have violated the bond condition, the principal (Reid) must have tendered the checks for the purpose of *purchasing* motor vehicles. *See id.* Our task is to determine the scope of the bond condition and whether the transactions which serve as the basis for MRD's claims fall within it.

Gramercy argues that it is not liable as surety because (1) Reid purchased the vehicles from Don McGill and Intercontinental with financing from MRD; (2) Reid paid MRD $5,000–$6,000 per month for the right to draw on MRD's account; (3) MRD never owned the vehicles and, thus, could not have sold them to Reid; (4) Reid did not tender the checks to MRD for the purpose of "buy[ing] motor vehicles;" and (5) the checks Reid gave to MRD merely reimbursed MRD for "floorplanning the vehicles," i.e. loaning Reid the funds to purchase the vehicles.

The undisputed summary judgment evidence shows that MRD and Reid had an oral floor plan agreement. Reid routinely drafted on MRD's bank account to purchase vehicles and repaid MRD upon selling the vehicles to third parties. The owner and president of MRD, Doug Dyer, gave detailed testimony outlining the floor plan arrangement and course of dealing between Reid and MRD. According to Dyer, Reid located vehicles she wished to buy and financed their purchase with drafts drawn on MRD's bank account. Under this arrangement, Reid could draft on MRD's bank account for up to $150,000. For use of this line of credit, Reid paid between $5,000 and $6,000 per month, depending upon the number of drafts run through MRD's account. Dyer testified that this floor plan agreement lasted approximately a year and a half, beginning in late 1996. Reid tendered the two checks at issue in 1997, within the time during which MRD admits the floor plan arrangement existed. According to Dyer, it was Reid's practice to repay each draft with a check for the *exact* amount of the draft used to purchase a vehicle. Dyer admitted that the two drafts drawn on and paid through MRD's account were "for vehicles [the BMWs] which were floor planned by MRD." Dyer further admitted that Reid gave the checks at issue *"in payment of ... those two drafts."* MRD retained possession of the certificates of title to the BMWs until Reid sold them to third parties. However, titles to the BMWs were never assigned to Dyer or MRD. Moreover, it was Reid, and not MRD, who insured the vehicles purchased under the floor plan arrangement, and all of these vehicles remained on Reid's lot.

The surety bond Gramercy issued incorporates section 503.033's mandatory bond condition, stating that "the Principal shall pay all valid bank drafts, including checks, drawn by the Principal *for the purchase of motor vehicles* and transfer good title to each motor vehicle that the Principal purports to sell...."[2] Thus, both the plain

---

2. Emphasis added. Section 503.033's mandatory bond condition provides that a surety bond must be "conditioned on ... (A) the payment by the applicant of all valid bank

language of the statute and the bond itself require that to violate a condition of the surety bond, Reid must have given the two checks to *purchase* the vehicles. *See* Tex. Trans. Code Ann. § 503.033(b)(2)(A). Otherwise, the transfer of such checks would not implicate the motor vehicle dealer's surety bond.

MRD points out that the checks designate specific vehicles (BMWs) in the notation sections, indicating Reid tendered the checks to *purchase* these particular automobiles. However, a notation designating a specific vehicle on a check that was issued for the exact amount of the draft used to acquire the vehicles is consistent with (1) Reid *reimbursing* MRD *for the financing* of a particular BMW and (2) Dyer's testimony that Reid issued the checks to pay off the two drafts.

MRD also points out that the checks were made in the exact amount of the drafts tendered to the sellers of the BMWs (Don McGill and Intercontinental). Although MRD received no profit from what it asserts was a "sale" to Reid, it did receive $5,000 $6,000 per month under an acknowledged floor plan agreement to finance Reid's purchase of vehicles. The tender of these checks was consistent with how Dyer testified the floor plan arrangement worked. Moreover, the certificates of title show that the titles to the motor vehicles were transferred from Don McGill Imports and Intercontinental (recipients of the sight drafts) directly to Reid, and then to other buyers.

The summary judgment evidence establishes that MRD already had financed Reid's purchase of the vehicles before Reid tendered the two checks that were later dishonored for insufficient funds. Under Texas law, payment occurs when an obligation is satisfied either directly, by the obliged party, or indirectly, *"on behalf of* a party obliged to pay the instrument." Tex. Bus. & Com.Code Ann. § 3.602(a) (Vernon Supp.2001) (emphasis added). "Both methods of payment are equally effective to discharge 'the obligation of the party obliged to pay the instrument.'" *Lawyers Surety Corp. v. Riverbend Bank, N.A.,* 966 S.W.2d 182, 186 (Tex.App.—Fort Worth 1998, no pet.) (quoting § 3.602(a)). Once a draft is accepted by a bank, the drawer (Reid) is discharged. *See* § 3.414(c). Thus, to the extent MRD made payment on Reid's behalf to the persons entitled to enforce the bank drafts (Don McGill and Intercontinental), *Reid paid* the bank drafts. *See* § 3.602(a); *Lawyers,* 966 S.W.2d at 186. Because Reid already had ownership of the BMWs, through her financed purchase, she could not have made a second purchase of the same vehicles from MRD through tender of the two checks to MRD.

Furthermore, it is illogical that Reid would pay $5,000 $6,000 per month for floor plan financing *and* create drafts, drawn on MRD's bank account, so that *MRD* could purchase the vehicles and resell them to Reid at cost. Indeed, the very essence of a floor plan agreement is that the financier facilitates, for a fee, *another's* purchase. *See Lawyers,* 966 S.W.2d at 186. Thus, while Reid may have violated her floor plan agreement with MRD by issuing checks dishonored due to insufficient funds, Reid did not violate the bond condition. Accordingly, we find that Reid's tender of the two checks to MRD was not for the purpose of *purchasing motor vehicles* but instead was an attempt to extinguish a debt she owed to MRD for financing her purchase of the vehicles, pur-

---

drafts, including checks, drawn by the applicant *to buy motor vehicles;* and (B) the transfer by the applicant of good title to each motor vehicle the applicant offers for sale." Tex. Trans. Code Ann. § 503.033(b)(2)(A) (Vernon 1999) (emphasis added).

suant to their floor plan agreement. We sustain Gramercy's first three points of error.

■ We now consider the effect of the MRD/Reid lawsuit on MRD's bond claim. The governing statute provides that any "person" may recover against a surety bond if that person obtains a judgment against a dealer assessing damages and reasonable attorney fees "based on an act or omission on which the bond is conditioned...." TEX. TRANS. CODE ANN. § 503.033(d) (Vernon 1999). In construing this statute, this court has previously held:

> A judgment obtained against a principal creates only a prima facie case for liability against the surety who was not made a party or given an opportunity to defend the suit in which the judgment was obtained.... The surety, when sought to be made liable by the judgment creditor, may interpose any valid defense that could have defeated the plaintiff's case at the time the initial judgment was obtained.

*Gramercy Ins. Co. v. Arcadia Financial Ltd.*, 32 S.W.3d 402, 407 (Tex.App.—Houston [14th Dist.] 2000, no pet.) (citation omitted). Here, the surety, Gramercy, was not a party to the MRD/Reid lawsuit. Thus, in responding to MRD's motion for summary judgment, Gramercy was entitled to assert any available defense.

■ The proof developed at trial shows that MRD's judgment against Reid, and MRD's claim against the bond, were not, in fact, "based on" Reid's failure to pay valid drafts *for the purchase of motor vehicles*. Thus, there was no breach of the bond condition. The absence of such a breach, necessary to trigger Gramercy's liability as surety, is a valid defense which could have defeated MRD's claim that Reid failed to pay "all valid bank drafts, including checks, drawn by the applicant to buy motor vehicles." TEX. TRANS. CODE ANN. § 503.033(b)(2)(A) (Vernon 1999). Therefore, the judgment for MRD against Reid in the MRD/Reid lawsuit notwithstanding, Gramercy is not liable as a surety on the motor vehicle dealer's surety bond. Thus, the trial court erred in entering summary judgment for MRD and in denying Gramercy's motion for summary judgment. Accordingly, Gramercy's sixth point of error is sustained. Our determination of this point renders consideration of Gramercy's fourth and fifth points of error unnecessary.

## V. CONCLUSION

MRD has not established, as a matter of law, that Reid's tender of the checks was for the purchase of vehicles from MRD. To the contrary, the undisputed summary judgment evidence clearly shows that MRD and Reid had a floor plan financing agreement, that Reid bought the vehicles from Intercontinental and Don McGill using funds provided by MRD, and that the two checks Reid later gave to MRD were in repayment of the financing MRD provided, not for the purchase of the vehicles. This finding that Reid did not tender checks to purchase motor vehicles is a dispositive issue. The surety bond statute as well as the bond itself require that the surety may be held liable *only* where the principal has violated the bond condition. Because Reid did not violate the bond condition, Gramercy is not liable as surety on the bond. Accordingly, we reverse the summary judgment entered for MRD, and render judgment in favor of Gramercy.