GRAMERCY INSURANCE COMPANY, INC., Appellant,

v.

AUCTION FINANCE PROGRAM, INC. A Delaware Corporation, Appellee.

No. 05–99–01823–CV.

Court of Appeals of Texas, Dallas.

July 11, 2001.

Rehearing Denied Aug. 16, 2001.

William O. Holston, Jr., Sullivan Ave & Holston, Dallas, for appellant.

Raymond Douglas Noah, Christopher Charles White, Wilson Elser Moskowitz Edelman & Dicker L.L.P., Dallas, for appellee.

Before LAGARDE, FITZGERALD, and RICHTER, JJ.

## OPINION

LAGARDE, Justice.

Gramercy Insurance Company (Gramercy) appeals the trial court's grant of summary judgment in favor of Auction Finance Program, Inc. (Auction Finance) and the trial court's denial of Gramercy's motion for summary judgment against Auction Finance. Gramercy presents five issues for review. Gramercy's first three

issues require a determination of (i) whether the checks involved in this case were drawn to buy motor vehicles or to repay funds advanced in connection with floor plan financing agreements, and (ii) whether the floor plan financing agreements in this case fall within the scope of Texas Transportation Code section 503.033. The fourth issue is whether the trial court erred in failing to review the pleadings, facts, and circumstances in the underlying lawsuits and in determining that the judgments in those lawsuits supported the claims against the bonds issued by Gramercy. The final issue is whether the trial court erred in granting Auction Finance summary judgment and in denying Gramercy summary judgment. For reasons that follow, we affirm.

## FACTUAL BACKGROUND

Section 503.033 of the Texas Transportation Code requires motor vehicle dealers to obtain a $25,000 surety bond in order to maintain their licenses. TEX. TRANSP. CODE ANN. § 503.033 (Vernon 1999). Gramercy is an insurance company authorized to issue such surety bonds. Auction Finance is in the business of financing dealers and has contracts with various automobile auctions where dealers come to purchase used vehicles. An automobile auction house is a drive-through facility where sellers drive vehicles through and dealers competitively bid on them. A typical transaction would occur as follows: When a dealer, who is a principal on the required surety bond, successfully bids on a vehicle, he writes two checks payable to Auction Finance. One check is in the amount of the successful bid, together with the auction house's fee. The other check is payment for Auction Finance's administrative and interest fees for extending the line of credit to the dealer. Upon the dealer's delivery of the two checks to the auction house, the dealer takes possession of the vehicle. The auction house forwards the two checks to Auction Finance. When the seller signs over unencumbered title to the vehicle, whether in the dealer's name or on open account, and delivers the title to the auction house, the auction house pays the seller the purchase price of the vehicle minus the auction house's fee. The auction house then produces a report to Auction Finance regarding the transaction, and Auction Finance, in turn, wires funds to the auction house in the amount of the purchase price of the vehicle, plus the auction house's fee. The auction house holds the title until Auction Finance authorizes its release to the dealer. The dealer's check is not deposited by Auction Finance for a negotiated period to allow the dealer time to locate a buyer. After receipt of unencumbered title by the auction house, and upon deposit of the dealer's check by Auction Finance, the title is delivered to the dealer. The title is never signed over to the auction house or Auction Finance. According to the terms of the written agreement between Auction Finance and the dealer, Auction Finance is given a security interest in the vehicle and the title certificate to secure the indebtedness due it from the funds sent to the auction house.

In this case, Gramercy issued bonds in favor of Jimmy Williams d/b/a Williams Cars & Trucks (Williams) and Tom Griffin d/b/a Griffin Motors (Griffin) as used car dealers. In August 1997, Williams successfully bid on numerous vehicles. Williams issued fourteen checks to Auction Finance that were dishonored. Auction Finance sued Williams, and on May 26, 1998, the trial court granted Auction Finance summary judgment against Williams, awarding damages in the amount of $62,846.44 for dishonored checks signed and issued by Williams to purchase motor vehicles. The trial court also awarded

Auction Finance breach of contract damages and reasonable attorney fees. In November 1997, Griffin successfully bid on numerous vehicles. Griffin issued twenty-seven checks to Auction Finance that were dishonored. Auction Finance sued Griffin. On April 9, 1998, the trial court entered a default judgment in favor of Auction Finance against Griffin in the amount of $25,000. Auction Finance sought to collect on the surety bonds.

Gramercy brought a declaratory judgment action seeking a declaration that Gramercy had no obligation to pay the claims made by Auction Finance against the surety bonds. Auction Finance counterclaimed for declaratory relief and breach of contract. The trial court denied Gramercy's summary judgment motion and granted Auction Finance's, awarding Auction Finance $50,000 [1] in actual damages, plus reasonable attorney fees and interest. Gramercy appeals.

### STANDARD OF REVIEW

■ Summary judgment movants have the burden of showing there are no genuine issues of material fact, and they are entitled to summary judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). When both parties file motions for summary judgment, each must carry its burden and neither may prevail because of the failure of the other to discharge its burden. *Villarreal v. Laredo Nat'l Bank*, 677 S.W.2d 600, 605 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.). Where there are competing motions for summary judgment,

and one is granted and the other is denied, the appellate court may consider the grant as well as the denial, if the appellant complains of both on appeal. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988) (per curiam).

■ In this case, the parties do not argue that a material question of fact exists which should have precluded summary judgment. Instead, the issues presented involve the proper construction of a specific statutory provision, and application of that provision to the undisputed facts of this case. Where, as here, the issues raised are based upon undisputed facts, the reviewing court may determine the questions presented as a matter of law. *McCreight v. City of Cleburne*, 940 S.W.2d 285, 288 (Tex.App.—Waco 1997, writ denied). The reviewing court may affirm the judgment, or reverse and render the judgment the trial court should have rendered. *Jones*, 745 S.W.2d at 898.

### STATUTORY BOND COVERAGE

■ We review the first three issues together. These issues raise the crucial question of whether the relevant, undisputed facts of this case fall within the scope of section 503.033 of the Texas Transportation Code. Section 503.033(b)(2)(A) sets out one of the conditions placed upon motor vehicle dealer surety bonds: "the payment by the applicant of all valid bank drafts, including checks, drawn by the applicant to buy motor vehicles." TEX. TRANSP. CODE ANN. § 503.033(b)(2)(A) (Vernon 1999).[2] Thus, we must determine if the checks involved in this case were drawn "to buy

---

1. The Williams bond and the Griffin bond were each in the amount of $25,000.

2. In this case, the language of the bonds essentially tracks the language of the statute; however, the bonds state "for the purchase of motor vehicles," whereas the statutory language is "to buy motor vehicles." We do not

consider this semantical difference significant. Regardless, the language of the statute controls. *See Geters v. Eagle Ins. Co.*, 834 S.W.2d 49, 50 (Tex.1992) (citing *Howze v. Sur. Corp. of Am.*, 584 S.W.2d 263, 266 (Tex. 1979)).

motor vehicles," which would place them within the scope of both the statute and the bonds. The parties agree that the liability of the surety is determined by the language of the bond, and that a statute mandating a bond is made part of the bond and is controlling. *Geters v. Eagle Ins. Co.,* 834 S.W.2d 49, 50 (Tex.1992); *Howze v. Sur. Corp. of Am.,* 584 S.W.2d 263, 266 (Tex.1979). The parties differ, however, on how the language of section 503.033 is to be construed.

■ Gramercy argues that a surety is recognized in law as a guaranty, and that pursuant to the rule of *strictissimi juris,* the statute should be strictly construed in order to avoid extending its liability beyond the terms of the statute. There is support for Gramercy's position that a surety agreement should be strictly construed. *Balboa Ins. Co. v. K & D & Assocs.,* 589 S.W.2d 752, 758 (Tex.Civ. App.—Dallas 1979, writ ref'd n.r.e.); *Frost Nat'l Bank v. Burge,* 29 S.W.3d 580, 591 (Tex.App.—Houston [14th Dist.] 2000, no pet.); *Augusta Court Co-Owners Ass'n v. Levin, Roth & Kasner,* 971 S.W.2d 119, 123 (Tex.App.—Houston [14th Dist.] 1998, pet. denied). However, the case law reflects that this rule of construction "applies only when the ordinary rules of contract construction render the parties' obligations under the surety agreement uncertain." *Augusta Court Co-Owners,* 971 S.W.2d at 123. As stated previously by this Court, "The rule of strict construction does not require a departure from the general rules of construction with a view of relieving the surety from an onerous condition or obligation, but merely provides that the surety's obligation shall not be extended by implication or presumption." *Balboa,* 589 S.W.2d at 758.

■ Auction Finance argues that the statute is remedial in nature and should be liberally construed in order to afford the greatest protection consistent with its remedial purpose. However, the case cited by Auction Finance to support its position involves a different statute. *City of La-Porte v. Taylor,* 836 S.W.2d 829, 832 (Tex. App.—Houston [1st Dist.] 1992, no writ). Moreover, even though section 503.033 is intended to protect persons doing business with motor vehicle dealers, the statute does not on its face state that it is to be liberally construed. *Cf. Howze,* 584 S.W.2d at 267 (quoting statute at issue, which stated its purpose and that it was to be liberally construed to promote that purpose). In keeping with the "cardinal law" in Texas, we first look to the plain and common meaning of the words of the statute. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 865 (Tex. 1999). Because we conclude the language of section 503.033 is unambiguous, it is not necessary to apply rules of construction to determine whether the transactions underlying Auction Finance's claims against the bonds fall within the scope of section 503.033. *Id.* at 865–66.

Two of our sister courts have construed and applied the specific subsection at issue here—section 503.033(b)(2)(A). *Gramercy Ins. Co. v. MRD Inv., Inc.,* 47 S.W.3d 721 (Tex.App.—Houston [14th Dist] 2001, no pet. h.); *Lawyers Sur. Corp. v. Riverbend Bank, N.A.,* 966 S.W.2d 182 (Tex.App.— Fort Worth 1998, no pet.). As here, the sureties in *Riverbend* and *MRD* argued that the condition in section 503.033(b)(2)(A) was not violated because the unpaid instruments were for the repayment of floor plan financing rather than to "buy motor vehicles." The courts of appeals in *Riverbend* and *MRD* agreed that the underlying transactions did not fall within the scope of the surety bonds, reversed and rendered judgment in favor of the sureties. *Riverbend,* 966 S.W.2d at 188; *MRD,* 47 S.W.3d at 727,. However,

the transactions underlying this case are factually distinguishable from those involved in *Riverbend* and *MRD*.

In *Riverbend*, Swedish, a used car dealer, obtained its statutorily required $25,000 surety bond from Lawyers Surety Corporation (Lawyers Surety). Riverbend, Swedish's bank, loaned Swedish $100,000 through two $50,000 lines of credit, which were evidenced by promissory notes. One of Swedish's lines of credit was a floor plan arrangement, secured by Swedish's automobile inventory. Pursuant to this arrangement, Swedish would issue a bank draft drawn on Riverbend payable to the seller for the purchase price. The seller would deposit the draft, the vehicle title, and other sales documents at the seller's bank. The seller's bank would credit the seller's account for the draft amount and forward the draft to Riverbend for payment. If the documents were in order and Swedish's line of credit was sufficient to cover the draft, Riverbend would pay the draft and charge the draft amount against Swedish's line of credit. If the documents were not in order, or if Swedish's line of credit was not sufficient to cover the draft, Riverbend would not pay the amount of the draft. In *Riverbend*, all parties agreed that Riverbend paid the sellers the amounts of the bank drafts.

Swedish eventually defaulted on its promissory notes. Riverbend foreclosed on its collateral and sued Swedish for the deficiency. The parties settled the lawsuit and entered into an agreed judgment that recited, among other things, the trial court's finding that Swedish failed to pay valid bank drafts drawn by Swedish on Riverbend for the purchase of motor vehicles. Armed with this judgment, Riverbend demanded payment under the surety bond. After payment was denied, Riverbend sued the surety to recover on the bond. Following a bench trial, the trial court rendered judgment for Riverbend for the full amount of the bond.

In reversing and rendering judgment for the surety, the court of appeals held that the transaction was not covered by section 503.033(b)(2)(A). *Riverbend*, 966 S.W.2d at 188. More specifically, the court stated that all valid bank drafts issued to buy. motor vehicles had been paid, because Riverbend paid, on Swedish's behalf, all drafts issued by Swedish. Had Riverbend refused payment on a bank draft issued by Swedish, the transaction would have been within the scope of section 503.033(b)(2)(A); however, all such bank drafts were paid. *Id.* at 186. "Whether Swedish later paid its *promissory notes* to Riverbend for the amounts charged against its floor plan line of credit had no effect on whether the bank drafts themselves were paid." *Id.* The only instrument Riverbend was entitled to enforce against Swedish was the note, and because "notes" are not included in the statute, the court rejected Riverbend's arguments. *Id.* at 187.

In *MRD*, the appellate court addressed issues almost identical to those presented here. *MRD*, 47 S.W.3d at 723–24,. In *MRD*, Reid operated as a used car dealer. Gramercy issued Reid the surety bond required by section 503.033. Reid contracted with MRD, a finance company, to obtain floor plan financing for the purchase of motor vehicles. In the summer of 1997, Reid issued two sight drafts drawn on MRD's account at Houston Community Bank. The first sight draft was to Don McGill Imports in the amount of $5,500 and indicated on its face it was in payment for a "1988 BMW 735i." The second sight draft was to Intercontinental BMW in the amount of $23,000 and indicated on its face it was in payment for a "1993 BMW 740i." Both of these drafts were paid upon pres-

entment, and MRD took possession of the respective certificates of title. A few weeks later, Reid wrote two checks payable to MRD. One check was for $23,000 and indicated on the memo line it was for a "93 740i." The other check was for $5,500 and indicated it was for an "88 BMW 735i." When Reid tendered these checks to MRD, MRD released the title certificates to Reid. Both of the checks were dishonored.

MRD sued Reid for conversion and breach of contract, claiming it was the owner of the two vehicles identified on the checks and that it had sold those vehicles to Reid. After obtaining a summary judgment against Reid based on the dishonored checks, MRD demanded that Gramercy, Reid's surety, pay under the bond. Gramercy refused, asserting that Reid had not violated the bond condition because the dishonored checks were written pursuant to the floor plan financing agreement between Reid and MRD, and were not tendered to buy motor vehicles. MRD sued Gramercy to recover on its bond claim. Both parties moved for summary judgment. The trial court granted MRD summary judgment in the amount of the bond, plus prejudgment interest and fees. The court of appeals reversed and rendered judgment in favor of Gramercy. *Id.*, 47 S.W.3d at 727. In construing the scope of section 503.033(b)(2)(A), the appellate court determined the transactions that served as the basis for MRD's claims did not result in a breach of the bond condition. *Id.*, 47 S.W.3d at 726–27. Citing *Riverbend*, the court held that Reid's "payment" for the purchase of the motor vehicles occurred when the sight drafts Reid issued to Don McGill Imports and Intercontinental BMW were paid by MRD on Reid's behalf. *Id*, 47 S.W.3d at 726. As that court reasoned, the drafts Reid issued to buy the motor vehicles were paid; it was the checks Reid wrote to MRD in

repayment of those drafts that were returned unpaid. *Id.* Consequently, although the dishonored checks written by Reid to MRD may have violated their floor plan agreement, it did not violate section 503.033(b)(2)(A) because all "valid bank drafts, including checks" drawn by Reid "to buy motor vehicles" were paid. *See id.;* TEX. TRANSP. CODE ANN. § 503.033(b)(2)(A).

The facts of this case are distinguishable from those in *Riverbend* and *MRD*. In each of those cases, the dealer issued "bank drafts" as payment for motor vehicles. These bank drafts were issued by the dealers, but drawn on accounts of the dealers' banks or finance companies. It is undisputed that all of the bank drafts involved in both *Riverbend* and *MRD* were, in fact, paid by the entity on which they were drawn. As the courts stated in *Riverbend* and *MRD*, these drafts were paid "on behalf of" the dealers who issued them. In both *Riverbend* and *MRD*, separate instruments were involved: (1) bank drafts issued for the purchase price of the vehicles; and (2) promissory notes or checks written to repay the loans or lines of credit depleted by the payment of the bank drafts. The default or failure to pay arose in connection with the second instruments, which, as the courts in *Riverbend* and *MRD* held, are not within the scope of section 503.033(b)(2)(A).

Here, the transactions were structured differently. Only one instrument was drawn or issued by the dealer for the purchase price of each vehicle. A dealer would write a check for the purchase price of the vehicle, plus the auction house's fee. Pursuant to the contractual agreement between the dealer and Auction Finance, Auction Finance would "hold" the dealers' checks until a later date. Meanwhile, Auction Finance would wire the amount of the purchase price to the auction house.

Gramercy argues that the dealers' dishonored checks constitute only a breach of the floor plan arrangement, as in *Riverbend* and *MRD*, not a breach of a bond condition. In other words, Gramercy asserts the dishonored checks were intended solely as repayment for the funds advanced by Auction Finance and were not intended to "buy motor vehicles."

We disagree. The dealers in this case wrote numerous checks for the purchase prices of specific motor vehicles. These checks were made payable to Auction Finance and were held by Auction Finance for a negotiated period before Auction Finance deposited them. Meanwhile, Auction Finance would advance the purchase price of the vehicles to the auction house. When Auction Finance deposited the dealers' checks, they were dishonored. Although this may constitute a breach of the contractual agreement between the dealers and Auction Finance to repay the money advanced by Auction Finance, it also constitutes a violation of the bond condition in section 503.033(b)(2)(A). These concepts are not mutually exclusive. In *Gramercy Insurance Co. v. Arcadia Financial Ltd.*, 32 S.W.3d 402 (Tex.App.—Houston [14th Dist] 2000, no pet.), the court determined that the same action—failing to provide good title—could support both a breach of contract claim against the dealer and a claim against the surety for the dealer's failure to deliver good title as required by section 503.033(b)(2)(B). *See id.* at 407.

According to Gramercy, holding that the underlying transactions in this case fall within the scope of section 503.033(b)(2)(A) and the surety bonds would impermissibly expand the terms of the statute. In support of its argument that the checks at issue were not written to buy motor vehicles, Gramercy argues that Auction Finance was never an owner of the motor vehicles, and thus, the dealers could not

have "bought" the vehicles from Auction Finance. As evidence of this point, Gramercy notes the vehicles' titles were never in Auction Finance's name, so Auction Finance could not have passed good titles to the vehicles.

We are unpersuaded. The case Gramercy cites on this point, *Gallas v. Car Biz, Inc.*, 914 S.W.2d 592 (Tex.App.—Dallas 1995, writ denied), is inapposite. *Gallas* involved disputed claims of ownership of a vehicle that was purchased with an unpaid sight draft and later sold to a third party, although title to the vehicle was never transferred to the original purchaser. *Id.* at 593. In *Gallas*, this Court construed the Texas Certificate of Title Act and held that the second sale of the vehicle was void because the seller never had title to the vehicle. *Id.* at 595. However, this case does not involve title to the vehicles or a sale of the vehicles by a person who did not have title. Auction Finance does not claim it was ever the owner of the vehicles or that it was selling the vehicles to the dealers. Auction Finance argues only that it is within the class of persons entitled to recover under section 503.033, and that the transactions underlying the judgments which form the basis of its claims against the bonds fall within the scope of section 503.033.

█ As the plain language of the statute currently reads, the transactions at issue in this case are covered by the statute. Section 503.033 is not limited to "buyers" or "sellers" of motor vehicles who transact business with dealers. Instead, the statute allows any "person" to recover against a surety bond if that person obtains a judgment against a licensed motor vehicle dealer "based on an act or omission on which the bond is conditioned." TEX. TRANSP. CODE ANN. § 503.033(d). As stated by the court in *Arcadia*, "section 503.033 is not facially limited to consumers

in its application.... Nothing in the statute's language limits the statute's application to the direct consumer or purchaser of the vehicle." *Arcadia*, 32 S.W.3d at 406–07. We agree. Had the legislature intended to limit the application of section 503.033 to buyers or sellers of motor vehicles, or to exclude any particular group, such as finance companies, from recovery, it could have expressly done so in the statute. Or, the legislature could have defined the phrase "to buy motor vehicles" to specifically exclude floor plan financing arrangements. But it did not. In essence, Gramercy asks us to interpret the statutory language "payment by the applicant of all valid bank drafts, including checks, drawn by the applicant to buy motor vehicles" to mean "payment by the applicant of all valid bank drafts, including checks, drawn by the applicant to buy motor vehicles, if such drafts or checks are made payable to and delivered to the direct sellers of motor vehicles, from whom title can pass." We will not read such a limitation into the statute. The checks at issue were the only instruments made payable to Auction Finance by the dealers in the amounts of the purchase prices of specific vehicles on which they successfully bid at auction. Auction Finance was entitled to enforce these instruments.

For all the reasons set out above, we hold the checks at issue in this case were drawn to buy motor vehicles. The fact that the checks were also intended to "repay" amounts advanced by Auction Finance does not place the transaction outside the scope of section 503.033(b)(2)(A).[3] Because we hold the transactions at issue fall within the scope of the statute, and, accordingly, within the surety bonds, we resolve Gramercy's issues one through three against it.

## UNDERLYING LAWSUIT

The crux of Gramercy's fourth issue is that the trial court should have examined the facts and pleadings in the Williams and Griffin suits and determined that the underlying facts did not support recovery under the surety bonds. Additionally, Gramercy argues the trial court erred in relying on the findings in the underlying judgments that Williams and Griffin were indebted to Auction Finance based on checks that were written to purchase motor vehicles and were subsequently returned unpaid due to insufficient funds. Specifically, the summary judgment against Williams awarded Auction Finance $62,846.44 based on "checks that were signed by Williams to purchase motor vehicles and were dishonored by William's [sic] bank and returned unpaid." The default judgment against Griffin found Griffin was indebted to Auction Finance in the sum of $25,000 as a result of "checks signed and issued by Griffin that were returned unpaid."

Rule 299(a) of the Texas Rules of Civil Procedure provides that findings of fact shall not be recited in a judgment. TEX.R. CIV. P. 299(a). Citing *Frommer v. Frommer*, 981 S.W.2d 811, 814 (Tex.App.—Houston [1st Dist.] 1998, pet. dism'd), Gramercy contends the trial court's reliance on the findings contained in the Williams and Griffin suits is an improper way to avoid the effect of rule 299(a). Gramercy correctly argues that a reviewing court is entitled to determine whether an underlying judgment alters the terms of a statutory judgment bond. *See Riverbend*, 966 S.W.2d at 188. We conclude, however, the summary judgment evidence presented to the trial court, including the records in the Williams and Griffin suits,

---

**3.** Moreover, we note that the checks were written before the money was advanced; con-

sequently, they could not have been written to "repay" what had not yet been paid.

establishes as a matter of law that Auction Finance obtained judgments against both Williams and Griffin based upon their failure to pay checks drawn to buy motor vehicles.

In its brief on this issue, Gramercy points to paragraphs from Auction Finance's petitions in the Williams and Griffin suits which, Gramercy claims, show that those lawsuits were for repayments of advances or lines of credit only, and not for checks written to purchase motor vehicles. However, the record reflects that those petitions contain claims for both breach of contract pursuant to a loan agreement and for dishonored checks. The petitions also had attached copies of the checks that formed the basis of Auction Finance's claims against Williams and Griffin.

A review of the record and applicable law reveals that the trial court did not err in finding as a matter of law that the judgments obtained in the Williams and Griffin suits were for dishonored checks that were signed by Williams and Griffin to purchase motor vehicles. Accordingly, we resolve Gramercy's fourth issue against it.

CROSS MOTIONS FOR SUMMARY JUDGMENT

In its fifth and final issue, Gramercy contends the trial court erred in granting Auction Finance's motion and in denying its motion because Gramercy was entitled to judgment as a matter of law. Gramercy does not direct us to any evidence in the record that either establishes its right to or defeats Auction Finance's right to summary judgment as a matter of law. Acknowledging there are no genuine issues of disputed fact, Gramercy contends the trial court failed to correctly analyze and apply the law. After reviewing the record, we disagree.

We have previously held that the transactions in the Williams and Griffin suits were for the purpose of purchasing motor vehicles, and, therefore, Auction Finance was within the coverage of section 503.033 and of the surety bonds. We have also previously held that, based on the summary judgment evidence presented to the trial court, it did not err in finding as a matter of law that the judgments in the Williams and Griffin suits were for dishonored checks drawn by Williams and Griffin for the purpose of purchasing motor vehicles. Accordingly, we resolve Gramercy's fifth issue against it.

We affirm the trial court's judgment.