Stephen G. **RUDISILL**, Ronald B. Coolley, and Slawomir Z. Szczepanski, Appellants

v.

**ARNOLD WHITE & DURKEE, P.C., Appellee.**

No. 14–03–00508–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 30, 2004.

Sean Gorman, George R. Gibson and David M. Gunn, for appellants.

Andrea E. Treiber, Kimberly Marie Phillips, and William E. Matthews, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices FROST and GUZMAN.

## MAJORITY OPINION

ADELE HEDGES, Chief Justice.

Appellants filed this declaratory judgment action seeking a declaration of their rights following the combination of two law firms, Arnold White & Durkee, P.C. ("AWD"), and Howrey & Simon ("H & S"), which combined to form Howrey Simon Arnold & White, L.L.P. ("HSAW"). Appellants, Stephen Rudisill, Ronald Coolley, and Slawomir Szczepanski, were AWD shareholders at the time of the combination. The trial court granted summary judgment in favor of AWD. We affirm.

## I. Background

In 1999, AWD and H & S entered negotiations to combine their operations. AWD's board of directors noticed a shareholders' meeting for January 7, 2000, for the purpose of voting on the proposed combination. The notice stated that a two-thirds majority of Class B and Class C shares would be required for passage. Appellants, each being a holder of Class B or Class C shares, submitted written objections to the combination prior to the meeting. Appellants then voted against the combination, which was approved by a two-thirds vote.

Under the terms of the Combination Agreement, all of AWD's assets not specifically excluded were transferred to H & S. In exchange, AWD became a "Level II Partner" in H & S, which subsequently changed its name to HSAW. The only excluded assets were three vacation condominiums, two insurance policies, and several automobile leases. Closing and transfer of assets occurred on or after January 31, 2000.

AWD shareholders were eligible to become partners in HSAW by signing the Partnership Agreement. Appellants declined to sign the agreement, ceased working for AWD, and filed the present action seeking a declaration of their rights. Both sides moved for summary judgment. The trial court granted AWD's motion without stating the basis therefor. On appeal, appellants' three issues track their three causes of action. They contend that (1) they are entitled to dissenter's rights of redemption under the Texas Business Corporation Act ("TBCA"), (2) if they are not entitled to dissenter's rights, they should be reinstated to their full rights as shareholders, and (3) alternatively, they have the right to redeem their shares pursuant to the AWD Redemption Agreement.

## II. Standard of Review

■ Under the traditional standard for summary judgment, the movant has the burden to show that there is no genuine issue of material fact and that judgment should be granted as a matter of law. Tex.R. Civ. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). In

reviewing a grant of summary judgment, we take as true all evidence favorable to the nonmovant and make all reasonable inferences in the nonmovant's favor. *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 549 (Tex.1985). A defendant, as movant, is entitled to summary judgment if it (1) disproves at least one element of the plaintiff's theory of recovery or (2) pleads and conclusively establishes each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997). A plaintiff is entitled to summary judgment only if he conclusively proves all essential elements of his claim. *Johnston v. Crook*, 93 S.W.3d 263, 273 (Tex.App.-Houston [14th Dist.] 2002, pet. denied). When reviewing cross-motions for summary judgment, we consider both motions and render the judgment that the trial court should have rendered. *Coastal Liquids Transp., L.P. v. Harris County Appraisal Dist.*, 46 S.W.3d 880, 884 (Tex.2001).[1]

██ The relevant facts are generally undisputed. Indeed, at oral argument, both sides represented that there was no material issue of fact because there is no dispute regarding the facts of the case. The only dispute is a legal one: how to apply the relevant portions of the TBCA to the facts. To the extent the issues presented in this appeal involve statutory construction and application of the statute to undisputed facts, we determine the issues as a matter of law. *Gramercy Ins. Co. v. Auction Fin. Program, Inc.*, 52 S.W.3d 360, 363 (Tex.App.-Dallas 2001, pet. denied).

██ In interpreting a statute, whether or not we consider it ambiguous, we may consider, among other things: the object sought to be obtained; the circumstances of the statute's enactment; the legislative history; the common law or former statutory provisions, including laws on the same or similar subjects; the consequences of a particular construction; administrative construction of the statute; and the title, preamble, and emergency provision. Tex. Gov't Code Ann. § 311.023 (Vernon 1998); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex.2001). In examining the relevant portions of the TBCA, we focus primarily on the language of the statute itself and, to a lesser extent, the legislative history, including the interpretive commentaries attached to each section.[2] We consider a question of statutory interpretation under a de novo standard of review. *Bragg v. Edwards Aquifer Auth.*, 71 S.W.3d 729, 734 (Tex.2002).[3]

## III. Dissenter's Rights

In their first issue, appellants contend that the trial court erred in granting summary judgment against them because they are entitled to dissenter's rights under the

---

1. There is some dispute as to whether the trial court actually considered appellants' motion and whether the motion sought a final judgment; however, because we hold that the trial court properly granted AWD's motion, we need not decide whether appellants' motion is reviewable.

2. The interpretive commentaries were written by committees of the State Bar of Texas and not by legislative entities. They are particularly helpful as legislative history, however, because the committees originally proposed and drafted the language that became the TBCA and subsequently amended it. The committees based their work largely on the Model Business Corporation Act. *See, e.g.,* Tex. Bus. Corp. Act art. 2.01, cmt. of Bar Comm.—1955.

3. The parties do not cite, and we were unable to find, any published cases that have interpreted the sections of the TBCA at issue in this appeal.

TBCA, including the right of redemption for the "fair value" of the shares.

## A. The Texas Business Corporation Act

The TBCA provides two procedures for authorizing a sale when all or substantially all of the property and assets of a corporation are to be sold. *See* TEX. BUS. CORP. ACT arts. 5.09, 5.10 (Vernon 2003). The procedure that is followed is generally determined by whether the sale is deemed "in the usual and regular course of business of the corporation." *Id.* A sale is considered in the usual and regular course of business if, after the sale, "the corporation shall, directly or indirectly, either continue to engage in one or more businesses or apply a portion of the consideration received in connection with the transaction to the conduct of a business in which it engages following the transaction." *Id.* art. 5.09(B).

A sale in the usual and regular course of business can be authorized by the board of directors without shareholder approval. *Id.* art. 5.09(A). If a sale is not in the usual and regular course of business, the board must obtain approval from two-thirds of the outstanding shares entitled to vote on the proposed sale. *Id.* art. 5.10(A)(4).[4] Under the latter scenario, dissenters to the sale (*i.e.*, shareholders who voted against the sale but lost) have certain rights, including the right to redeem

their shares for "fair value." *Id.* arts. 5.11, 5.12. AWD generally followed the procedure for a sale that was not made in the usual and regular course of business and obtained a two-thirds majority favoring the sale. *See id.* art. 5.10. Notwithstanding that the procedure utilized is inconsistent with its position at trial and on appeal, AWD contends that appellants are not entitled to dissenter's rights because the sale was in the usual and regular course of business.

According to the 1996 comment to article 5.09, the statute "was amended in 1987 to substantially expand the types of transactions that would not constitute a disposition of all or substantially all assets. . . ." *Id.* art. 5.09, cmt. of Bar Comm.—1996. The 1987 amendment, which added section B to the article, provided that a sale is in the usual and regular course of business if, after the sale, "the corporation shall, directly or indirectly, either continue to engage in one or more businesses or apply a portion of the consideration received in connection with the transaction to the conduct of a business in which it engages following the transaction." *Id.* art. 5.09(B). The comment goes on to state, "In effect, no disposition of assets by a corporation will require shareholder approval unless the corporation liquidates and ceases to do business after the disposition." [5]

---

4. As will be discussed in detail below, when a sale is in the usual and regular course of business, article 5.09 *permits* the sale to be made upon authorization of the board only, but when a sale is not made in the usual and regular course of business, special authorization by the shareholders *must* be obtained under article 5.10. TEX. BUS. CORP. ACT art. 5.09, cmt. of Bar Comm.—1955; art. 5.10, cmt. of Bar Comm.—1955.

5. This interpretation is bolstered by a 1987 State Bar article written by two members (including the chairman) of the committee

that originally drafted the section B version which passed the legislature with only one grammatical modification. In the article, the members state that "[a]s a result of this change it is clear that a drop down of assets by a corporation to a . . . master limited partnership would not be an asset disposition requiring shareholder approval. In effect no disposition of assets by a corporation will require shareholder approval unless the corporation liquidates and ceases to do business after the disposition." 25 BULLETIN OF THE

The House Committee on Business and Commerce prepared an analysis of the proposed amendment. According to this analysis, section B was added

to redefine what constitutes the disposition of all or substantially all of the assets of a corporation. Cases in other jurisdictions have held or implied that disposition of assets, not normally considered to be included by the phrase "all or substantially all" required shareholder approval under statutes similar to TBCA articles 5.09 and 5.10. The comment to RMBCA [the revised model code] section 12.02 rejects the holding/implication in these cases, but the RMBCA itself lacks any statutory language that would dictate the opposite result. The amendatory language is similar to that in section 121.E of the Louisiana Business Corporation Law, in that shareholder approval is not required if a corporation engages in a business or applies any assets received from a sale in the business of the corporation.

SECTION ON CORPORATION, BANKING & BUSINESS LAW, STATE BAR OF TEXAS 12 (September 1987).

6. The cited section of the Louisiana statute governs voluntary transfers of corporate assets and provides as follows:

Nothing in this section is intended to restrict the power of any corporation, without authorization thereof by the shareholders, to sell, lease, exchange or otherwise dispose of any of its property if the entire corporate business is not ended thereby, or if some portion of the proceeds of such property is appropriated to the conduct or development of its remaining business.

LA.REV.STAT. ANN. § 121(E) (West 1994). One published case under the Louisiana provision deals with the transfer of assets from a corporation to a partnership. See Levy v. Billeaud, 443 So.2d 539 (La.1984). However, that case is of little use here because it is so readily distinguishable. The plaintiffs in Levy claimed that (1) the directors and appointed liquidator breached their fiduciary duties and

HOUSE COMM. ON BUS. & COMMERCE, BILL ANALYSIS, Tex. H.B. 418, 70th Leg., R.S. (1987).[6]

■ Clearly, the 1987 amendment was intended to "substantially expand" the types of transactions that would not require shareholder approval. See, e.g., TEX. BUS. CORP. ACT art. 5.09, cmt. of Bar Comm.—1996. In summary, a sale is made in the usual and regular course of business so long as the corporation is not liquidated and continues in some business, either directly or indirectly, after the sale.

### B. AWD Post–Combination

■ Under appellants' first issue, we examine whether AWD (1) continued to exist as a corporation after the combination and (2) continued directly or indirectly in the legal services business.[7] AWD contends that it is still a viable corporation in the legal services business as a partner in HSAW. We agree.

### 1. AWD's Evidence

Uncontroverted summary judgment evidence established that, after the combina-

(2) plaintiffs would have received no compensation for their shares if they refused to join the partnership. See id. at 541, 544. Here, appellants make no breach of fiduciary duty claims, and it is undisputed that, at a minimum, they are entitled to receive compensation for their shares under the AWD Redemption Agreement.

7. It is undisputed that all or substantially all of AWD's assets were transferred to HSAW. It is also important to note that, although the statute provides that a corporation can continue in business if it applies a portion of the consideration received from the transaction to the conduct of a business in which it engages following the transaction, the parties have, for the most part, limited their arguments to whether AWD continued in the legal services business after the combination. TEX. BUS. CORP. ACT art. 5.09(B). We shall therefore confine our discussion to that context.

tion, AWD continued to be a Texas corporation in good standing with the Texas Comptroller's office, and it continued to have shareholders, employees, directors, officers, and annual meetings.[8] Evidence further established that AWD maintained its own financial and payroll records and filed separate federal and state tax returns. As a Level II Partner in HSAW, AWD enjoyed voting rights and profits commensurate with its percentage share of the partnership.[9] AWD received Schedule K–1s from HSAW, evidencing profit or loss from the partnership. For a year and a half after the combination, it continued to have a separate office in Chicago. For the first year, only AWD shareholders were allowed to share in any contingency fees generated by AWD or its shareholders.[10]

## 2. Appellants' Counter Arguments

Appellants contend that, in reality, AWD was subsumed in the resulting combination and that the remaining corporate structure is merely a shell that does not engage in any business. They base this argument primarily on the assertion that AWD could not remain in the legal services business because it transferred all of the assets it

required for that business.[11] First, we note that the TBCA contains no requirement that a company retain or receive any physical assets in order for it to continue in business after transferring all or substantially all of its assets. Indeed, article 5.09 permits a sale in the usual and regular course of business to be made for such considerations as are authorized by the board of directors and "may consist in whole or in part of money or property, real or personal, including shares of any other corporation, domestic or foreign." Tex. Bus. Corp. Act art. 5.09. Thus, the drafters of the TBCA envisioned that a corporation could continue in business despite transferring all of its assets and receiving only cash or corporate stock in return.

The language of article 5.09 is expressly nonexclusive in listing the types of considerations that may be exchanged for a corporation's assets, and there is a logical inference that ownership in a partnership would meet the statutory requirements. *See* 25 Bulletin of the Section on Corporation, Banking & Business Law, State Bar of Texas 12 (asserting that a drop-down of assets by a corporation to a partnership would not require shareholder approval under the TBCA); *see also supra* n. 2.

---

**8.** Appellants point out that the number of AWD shareholders and employees has dwindled since the combination and is unlikely to be replenished. However, appellants make no arguments and cite no authority, and we are aware of none, suggesting that these facts prevent AWD from being a live corporation.

**9.** The HSAW Partnership Agreement creates two levels of partnership; a Level II Partner has greater voting and other partnership rights than does a Level I Partner.

**10.** Appellants point out that AWD currently has no source of income other than what it receives as a HSAW partner, does not service clients separately from HSAW, and does not market itself as a separate firm. They further assert that all AWD shareholders now hold

themselves out as partners in HSAW. However, appellants again offer no explanation or authority regarding how these facts prevent AWD from being a viable corporation in the legal services business.

**11.** As assets required for the practice of law, appellants list cash, accounts receivable, work-in-progress, leasehold interests, furniture, fixtures, and equipment. However, despite the offices, computers, software, fax machines, paper, pens, and pencils most lawyers use in their practices, the only "asset" truly indispensable to continuing in the legal services business is the lawyer him- or herself. Post-combination, AWD continued to retain attorneys as shareholders and employees and, as a HSAW partner, it indirectly retained the services of many more.

Appellants do not argue that the partnership interest held by AWD in HSAW is not a valuable asset.[12]

It is clear that AWD remained in the legal services business, at least indirectly, in that (1) its shareholders and employees continued to practice law under the auspices of HSAW, and (2) it held an ownership interest in HSAW, which unquestionably continues directly in that business. Accordingly, the summary judgment evidence supports the conclusion that AWD is still a viable corporation directly or indirectly continuing in the legal services business as a matter of law. Therefore, the sale was made in the usual and regular course of business. *See* TEX. BUS. CORP. ACT art. 5.09(B).

Additionally, appellants contend that because AWD obtained shareholder approval under TBCA article 5.10, and thus established immunity for the directors under article 5.12(G), it could not subsequently deny appellants' rights as dissenters under article 5.11(A)(2). TEX. BUS. CORP. ACT arts. 5.10, 5.11(A)(2), 5.12(G). Appellants have misread the statute. Article 5.12(G) expressly limits its scope to corporate actions listed in article 5.11. *Id.* art. 5.12(G).[13] The only action listed in article 5.11 that appellants contend applies here is subsection 2, which provides that shareholders have the right to dissent to a sale of all or substantially all of a corporation's assets "*if special authorization of the shareholders is required.*" *Id.* art. 5.11(A)(2) (emphasis added). In this case, special authorization of the shareholders was not required because AWD continued in business after the transfer or sale of all or substantially all of AWD's assets. Even though AWD generally followed the procedures under article 5.10, it was not *required* to do so; thus, appellants are not entitled to dissenter's rights.

Appellants further suggest that articles 5.09 and 5.10 are both mandatory; *i.e.,* a sale in the usual and regular course of business *must* be accomplished under 5.09, and a sale not in the usual and regular course of business *must* be accomplished under 5.10. The commentary to these articles makes it clear that the procedures under 5.10 are mandatory, while the procedures under 5.09 are not. The commentary states: "Article 5.10 *requires* special authorization of the shareholders for a sale ... of all or substantially all of a corporation's assets if not made in the usual and regular course of business," and "Article 5.09 *permits* a sale ... of all or substantially all the assets when made in the usual and regular course of business to be made upon authorization of the board of directors." TEX. BUS. CORP. ACT art. 5.09, cmt. of Bar Comm.—1955; art. 5.10, cmt. of Bar Comm.—1955 (emphasis added). Because AWD was not required to follow the procedures in article 5.10 in selling its assets to H & S, appellants are not entitled to dissenter's rights. In sum, AWD continued to exist as a corporation after the combination, and it continued, at least indirectly, in the business of providing legal services. Accordingly, we overrule appellants' first issue.

## IV. Shareholder Status

■ In their second issue, appellants contend that, if they are not entitled to dissenter's rights, they should be restored

---

12. Indeed, in their Reply Brief, appellants assert that in the transaction AWD "received from the new firm stock [sic] equal to the entire value of [AWD's] assets."

13. Article 5.12(G) specifically provides that, in the absence of fraud in the transaction, the remedy of a dissenting shareholder under article 5.11 is the exclusive remedy for the recovery of the value of his or her shares. TEX. BUS. CORP. ACT art. 5.12(G).

to their position as shareholders and given their shares of any corporate profits distributed in the interim. AWD contends that appellants are not entitled to any post-combination distributions because their employment with AWD was terminated prior to any such disbursements, thus triggering automatic redemption under the AWD Redemption Agreement.

Appellants first contend that the operation of TBCA article 5.13 restores their rights as shareholders. Tex. Bus. Corp. Act art. 5.13. Article 5.13 provides that once a shareholder claims dissenter's rights under article 5.12, he or she may not exercise the rights of a shareholder. *Id.* art. 5.13(A). If, however, a court determines that the shareholder is not entitled to dissenter's rights, the shareholder's status shall be restored, and the shareholder shall be entitled to receive any distributions made in the interim. *Id.* art. 5.13(C). Appellants contend that, if this Court decides that they are not entitled to dissenter's rights, each should have his shareholder status restored. We disagree with appellants' contention. Nothing in article 5.13 suggests that a former shareholder can regain his or her shares based on an unsuccessful claim of dissenter's rights if shareholder status has otherwise been terminated.

The AWD Redemption Agreement provides that upon termination of employment with the corporation "for any reason," a shareholder loses his or her rights, and the shares are to be redeemed "as of the end of the last day of the Shareholder's employment." [14] Each of the appellants left their employment with AWD some time in late January or early February 2000, which was around the time the combination was completed. [15] Although it is unclear why the appellants' employment was terminated, under the Redemption Agreement, the reason is irrelevant. As stated, if "for any reason" employment is terminated, the shares are redeemed as of the end of that very day. Thus, appellants' shares are considered redeemed as of the day they left employment. It follows that, once redeemed, shares are not susceptible of revival and former shareholders are not entitled to reinstatement under the TBCA.

Appellants additionally argue that their shares could not be considered to have been redeemed because they have not received payment for them. Under the Redemption Agreement, redemption occurs on the day of termination irrespective of whether payment was tendered on that day. The agreement provides a payment schedule, and it is clear that the lack of immediate payment was not intended to mean that the shareholder retains the shares or the attendant rights of ownership until the full amount (or any amount) is actually paid. Furthermore, it is undisputed that AWD has tendered payment to appellants, and appellants have thus far refused to accept it. [16] Appellants cannot refuse payment and then argue that their shares have not been redeemed because they have not received payment.

14. Absent ambiguity, we interpret a contract as a matter of law. *DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). Appellants do not specifically contend that the Redemption Agreement is ambiguous, nor do we so find.

15. In their respective depositions, Stephen Rudisill testified that he stopped being an AWD shareholder in January 2000 and that he has not been employed by AWD since that time; Ronald Coolley testified that he was no longer an AWD employee as of February 1, 2000; and Slawomir Szczepanski testified that he has not been employed by AWD since either late January or early February 2000.

16. This fact is discussed in greater detail in the next section of the opinion.

There is no evidence that appellants failed to receive any distributions that occurred before termination of their employment and the consequent redemption of their shares.[17] Because any distributions occurred after appellants left the firm, they are not entitled to participate in the distributions. The trial court did not err in granting summary judgment against this alternative claim. Appellants' second issue is overruled.

## V. Redemption

■ In their third issue, appellants contend that even if they are not entitled to dissenter's rights or reinstatement, they are entitled to payment under the AWD Redemption Agreement. Appellants' third cause of action specifically sought "a declaration that plaintiffs are entitled to enforce their rights under the Redemption Agreement." AWD contends that because it does not deny that appellants have a right to redemption under the agreement and, in fact, has tendered payment pursuant to the agreement, the third cause of action does not present a justiciable controversy. We agree.

■ A claim alleging a lack of a justiciable controversy challenges the plaintiff's standing to sue and, consequently, the court's subject matter jurisdiction over the cause of action. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993). Subject matter jurisdiction is a question of law that we review

de novo. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex.1998). For a plaintiff to have standing and a court to have jurisdiction in a declaratory judgment action, there must be a "real controversy between the parties [that] will be actually determined by the judicial declaration sought." *Tex. Ass'n of Bus.*, 852 S.W.2d at 446.

In the trial court and on appeal, AWD has consistently maintained that appellants are entitled to payment for their shares under the Redemption Agreement. In fact, two months before suit was filed, AWD informed appellants' attorney by mail that "[y]our clients are still entitled to their contractual rights under the AWD ... Redemption Agreement." AWD's letter listed the amounts due to each of the appellants and stated that AWD was prepared to make the payments as listed. Appellants do not argue that the amounts are in error, nor have they pled a breach of contract action based on any delay in making payments. Because AWD has consistently and expressly acknowledged appellants' rights under the Redemption Agreement, a justiciable controversy does not exist on this issue. Therefore, judgment may not issue to declare those rights. *See Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex.1995).[18] Appellants' third issue is overruled.

The trial court's judgment is affirmed.

FROST, J., Concurring.

---

17. In her affidavit, Peggy McQuaid, AWD's administrative director, stated that AWD made no distributions to shareholders between January 31, 2000, and October 31, 2002, the latter being the date the affidavit was signed. In his deposition, Thomas Miller, as AWD's corporate representative, testified that AWD sold its ski condominiums in March or April of 2000, and he believed the proceeds were distributed to shareholders eight or nine months later. He further stated that AWD's South Padre condominium was sold in the month preceding July 26, 2001

(the date of the deposition), that the proceeds had not been distributed, and that he did not know if they would be. The record also contains a copy of an email from Miller, dated December 28, 2001, in which he states that the proceeds of the South Padre condominium, which totaled under $20,000, were being distributed.

18. In their reply brief, appellants assert that they are entitled to declaration of their rights to "avoid another lawsuit, for example, if they are reinstated as shareholders under Art. 5.13

KEM THOMPSON FROST, Justice, concurring.

Texas, like most other states, affords shareholders both the right to approve transactions that are not in the usual and regular course of the corporation's business [1] and the right to seek an appraisal remedy and fair value for their shares if they vote against such a transaction and it is nevertheless effected.[2] Texas, however, is unique in defining "usual and regular course of business" in a way that includes the most unusual, irregular, and extraordinary events in the life of a corporation. Texas' singular definition of this well-worn term in article 5.09(B) of the Texas Business Corporation Act [3] effectively eliminates the necessity for shareholder approval in many transactions that, in common parlance and understanding, would never be considered in the "usual and regular course of business."

Under Texas' unique statutory scheme, a corporation is given great latitude to structure a sale of all or substantially all of its assets in a way that does not require shareholder approval. As a result, minority shareholders are vulnerable to the actions of majority shareholders, who may freely configure a transaction effecting a fundamental corporate change in a way that avoids triggering the statutory shareholder protections. As illustrated in this case, shareholders can easily lose their ability to vote on a fundamental corporate change and their opportunity to benefit from an appraisal remedy. Although this statutory scheme may seem unfairly weighted against dissenting shareholders, this is the considered policy choice of the

Texas Legislature, and we must construe the statute in accordance with the Legislature's intent.

The Legislature's intent, though not clear on the face of the statute, is apparent after application of the appropriate rules of statutory construction: *A sale of all or substantially all of a corporation's assets is deemed to be in the "usual and regular course of business" as long as the corporation engages, directly or indirectly, in some business after the sale—even if the corporation did not engage in that business before the sale.*

The court is correct to conclude that appellee Arnold White & Durkee, P.C. continued to engage in business after selling substantially all of its assets, but the court need not determine whether the law firm's passive receipt of income as a partner in the newly created Howrey Simon Arnold & White, L.L.P. ("Howery Simon") constitutes engaging, directly or indirectly, in the legal services business. As explained below, article 5.09(B) does not require a corporation to engage in the same business after the asset sale for the transaction to qualify as one consummated in the "usual and regular course of business." Because Arnold White & Durkee continued in *some* business after the asset sale, shareholder approval was not required for this transaction. Therefore, appellants Stephen G. Rudisill, Ronald B. Coolley, and Slawomir Z. Szczepanski (collectively referred to as the "Shareholders") cannot prevail and the court is correct to overrule the issues they raise on appeal. Though I do not embrace all of the majori-

and wish to terminate." As we held above in regard to their second issue, appellants are not entitled to reinstatement as shareholders. Furthermore, a theoretical dispute, such as that contemplated by appellants, does not give rise to a justiciable controversy. *Bonham State Bank*, 907 S.W.2d at 467.

1. *See* TEX. BUS. CORP. ACT art. 5.10.

2. *See id.*, art. 5.12.

3. *See* TEX. BUS. CORP. ACT art. 5.09(B).

ty's reasoning, I respectfully concur in the court's judgment.

### STATUTORY CONSTRUCTION

#### *Is article 5.09(B) ambiguous?*

The majority does not address whether article 5.09(B) is ambiguous. As a threshold matter, the court should examine the text of the statute and determine if it is ambiguous. *See In re Mo. Pac. Ry. Co.,* 998 S.W.2d 212, 217 (Tex.1999). Under article 5.09, the board of directors generally has the power to sell all or substantially all of the corporation's assets without shareholder approval only if the sale is in the usual and regular course of the corporation's business:

A.  Except as otherwise provided in the articles of incorporation and except as provided in the next sentence of this section, the sale, lease, exchange or other disposition of all, or substantially all, the property and assets of a corporation, *when made in the usual and regular course of the business of the corporation,* may be made upon such terms and conditions and for such considerations, which may consist in whole or in part of money or property, real or personal, including shares of any other corporation, domestic or foreign, as shall be authorized by its board of directors, without authorization or consent of the shareholders. Except as otherwise provided in the articles of incorporation, the board of directors may authorize any pledge, mortgage, deed of trust or trust indenture and no authorization or consent of the shareholders shall be required for the validity thereof or for any sale pursuant to the terms thereof.

B.  *A transaction referred to in this Article and in Article 5.10 of this Act shall be in the usual and regular course of business if the corporation shall, directly or indirectly, either continue to engage in one or more businesses* or apply a portion of the consideration received in connection with the transaction to the conduct of a business in which it engages following the transaction.

TEX. BUS. CORP. ACT art. 5.09 (emphasis added).

In 1987, the Texas Legislature added article 5.09(B), which sets forth the circumstances under which a sale of all or substantially all of a corporation's assets is in the "usual and regular course of business." *See* Act of April 30, 1987, 70th Leg., R.S., ch. 93, § 25, 1987 Tex. Gen. Laws 203, 221 (codified at TEX. BUS. CORP. ACT art. 5.09(B)). If a sale of all or substantially all of a corporation's assets does not occur in the usual and regular course of its business under article 5.09(B), then article 5.10 requires the approval of the transaction by at least two-thirds of the corporation's shareholders. *See* TEX. BUS. CORP. ACT art. 5.09, 5.10. In this event, shareholders who do not vote their shares in favor of such a transaction and who follow the appraisal-remedy procedures outlined in article 5.12 are entitled to receive payment from the corporation for the fair value of their shares. *See* TEX. BUS. CORP. ACT art. 5.11, 5.12. If the sale is in the usual and regular course of the corporation's business, then shareholders do not get the benefit of any appraisal remedy. *See* TEX. BUS. CORP. ACT art. 5.09–5.11.

The Shareholders assert that a sale of all or substantially all of a corporation's assets is not in the usual and regular course of the corporation's business under article 5.09(B) if the corporation does not continue in one or more of the businesses that it conducted before the asset sale. Based on the text of the statute, this construction is reasonable because article 5.09(B) uses the language "continue to engage in one or more businesses," which logically could be interpreted to mean con-

tinuing to engage in at least one business that the corporation had engaged in before the sale. *See* Tex. Bus. Corp. Act art. 5.09(B). Furthermore, it is reasonable to require shareholder approval and to protect dissenting shareholders with an appraisal remedy when the nature of the corporation's business is being completely transformed.

The phrase "continue to engage in one or more businesses" connotes a carrying on of the business and its activities. Indeed, looking to the plain meaning of the word "continue," it is reasonable to conclude that the Legislature did not intend a cessation of the corporation's regular business activity but rather to keep up the activity already begun. *See* Webster's Third New International Dictionary 493 (1993 ed.) (defining "continue" as "to be steadfast or constant in a course or activity: keep up or maintain esp. without interruption a particular condition, course, or series of actions"). Likewise, "engaged in business" has been interpreted by Texas courts to mean "conducting, prosecuting, and continuing business by performing progressively all the acts *normally incident* thereto." *York v. Dotson,* 271 S.W.2d 347, 349 (Tex.Civ.App.-Fort Worth 1954, writ ref'd n.r.e.) (emphasis added). Acts that are "normally incident" to a business are logically those which are done "in the usual and regular course." The language used by the Legislature reasonably could be interpreted to mean continuing to carry on at least one business that had been conducted before the asset sale.

On the other hand, Arnold White & Durkee asserts that article 5.09(B) does not require that the corporation continue in any pre-sale business for the asset sale to be in the usual and regular course of the corporation's business. Rather, Arnold White & Durkee argues that as long as the corporation still exists and engages in *any* business whatsoever, then the sale must be considered in the "usual and regular course," as defined in article 5.09(B). This interpretation is also reasonable because "continue to engage in one or more businesses" could be interpreted less literally to mean continuing to engage in any business, regardless of whether the corporation had engaged in that business before the asset sale.

Furthermore, in discerning the meaning of the first part of article 5.09(B), we should consider it in the context of the entire provision. *See City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex. 2003) (stating that court interpreting a statute should read the statute as a whole and interpret it to give effect to the entire statute). Notably, under the second part of this statute (the part of article 5.09(B) not italicized above), it seems clear that application of a portion of the consideration received for the asset sale to the "conduct of a business" would qualify as falling within the "usual and regular course of business" for *any* business in which the corporation engaged following the sale. The lack of restriction in this related part of article 5.09(B) strongly suggests that the Legislature did not intend to impose such a requirement in this statute.

When there are at least two reasonable interpretations of the statute at issue, the provision is ambiguous, and we can and should properly rely on extratextual sources to determine its meaning. *See In re Mo. Pac. Ry. Co.,* 998 S.W.2d at 217. Because there is an ambiguity in article 5.09(B), we must apply the recognized rules of statutory construction to determine the meaning of this provision.

### *Does article 5.09(B) require the corporation to continue in at least one business that it conducted before the asset sale?*

In construing article 5.09(B), we should consider the Legislature's objectives in en-

acting this statute, the circumstances under which the statute was enacted, and the statute's legislative history.[4] *See Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex.2001). In addition, we should consider former law and similar statutory provisions as well as the consequences of the different statutory constructions under consideration. *See id.* In doing so, we must presume that the Legislature intended the entire statute to be effective and intended a just and reasonable result. *See id.*

### 1. The Purpose of the Appraisal Remedy and Shareholder Approval Requirement

Minority shareholders are vulnerable to abuse by the majority. *See* Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 DUKE L.J. 613 (1998). In the context of a proposed sale of all or substantially all of a corporation's assets not in the usual and regular course of the corporation's business, many states, including Texas, protect the minority shareholders by requiring that such a transaction be approved by an affirmative vote of the shareholders and by providing for an appraisal remedy for shareholders who do not vote for such a transaction, if the transaction is nonetheless approved. *See, e.g.*, TEX. BUS. CORP. ACT art. 5.10–5.12.

The common law required unanimous shareholder consent for fundamental corporate changes. *See Voeller v. Neilston*

*Warehouse Co.*, 311 U.S. 531, 536 n. 6, 61 S.Ct. 376, 378 n. 6, 85 L.Ed. 322 (1941). The common law thus allowed minority shareholders to arbitrarily block corporate changes in an attempt to gain some concession from the majority or to force a purchase of their shares at a premium. *See id.* When states abandoned the common-law rule in favor of statutes allowing approval of such actions by fewer than all of the shareholders, this change in the law mitigated the ability of minority shareholders to engage in nuisance or obstructionist behavior; however, it left them vulnerable to oppression by the majority. *See id.*; Wertheimer, 47 DUKE L.J. at 614–15. As a quid pro quo to protect minority shareholders, states provided a statutory appraisal remedy. *See Voeller*, 311 U.S. at 536 n. 6, 61 S.Ct. at 378 n. 6; Wertheimer, 47 DUKE L.J. at 614–15. Another purpose of the appraisal remedy is to allow shareholders to liquidate for fair value their investment in a corporation that is changing to a significantly different business, in which the shareholders do not wish to invest. *See* Wertheimer, 47 DUKE L.J. at 615. The appraisal remedy provides minority shareholders a way to liquidate an investment that is being significantly altered against their wishes. *See id.*

### 2. The Model Business Corporation Act and Statutes Similar to the Texas Business Corporation Act

In construing article 5.09(B), it is also appropriate to consider former statutory

---

4. Although the Code Construction Act does not apply to the Texas Business Corporation Act, the relevant common-law principles for construing the statute in this case are the same as those stated in the Code Construction Act. *See* TEX. GOV'T CODE ANN. § 311.002 (Vernon 1998) (stating that Code Construction Act applies only to (1) code enacted by 60th or subsequent Legislature, (2) amendment, repeal, revision, or reenactment of such a code, (3) repeal of a statute by a code, and (4) a rule

adopted under a code); *Dodd v. State*, 650 S.W.2d 129, 130 (Tex.App.-Houston [14th Dist.] 1983, no pet.) (applying same principle as that stated in Code Construction Act to statute that court acknowledged was not covered by Code Construction Act); *Harris Cty. v. Suburban Utility Co.*, 547 S.W.2d 72, 74 (Tex. Civ.App.-Houston [1st Dist.] 1977, no writ) (holding that Code Construction Act did not apply to statute at issue because that statute was not a code).

provisions and other statutes on the same or a similar subject. *See Bass v. Walker,* 99 S.W.3d 877, 885 n. 4 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). As the majority notes, the Texas Business Corporation Act is based on the Model Business Corporation Act. *Republic Nat. Bank of Dallas v. Whitten,* 383 S.W.2d 207, 212 (Tex.App.-Dallas 1964), *aff'd,* 397 S.W.2d 415 (Tex.1965); *see also* MODEL BUS. CORP ACT (1999 Supp.). Although article 5.09(B) was not taken from the Model Business Corporation Act, this court should still consider the statutory framework of the shareholder-approval requirement and the appraisal remedy of the Texas Business Corporation Act and recognize that these provisions are based on the Model Business Corporation Act. *See* TEX. BUS. CORP. ACT art. 5.10–5.12, MODEL BUS. CORP ACT §§ 12.01, 12.02, 13.02 (1999 Supp.). Under both Texas law and the Model Act, shareholder approval and the appraisal remedy apply when a corporation sells all or substantially all of its assets other than in the usual and regular course of its business. *See* TEX. BUS. CORP. ACT art. 5.10–5.12, MODEL BUS. CORP ACT §§ 12.01, 12.02, 13.02 (1999 Supp.).

The relevant Official Comment to the Model Act gives the following examples of the narrow circumstances under which it would be in the usual and regular course of a corporation's business to sell all of its assets: (1) "the sale of a building that was the corporation's only major asset where the corporation was formed for the purpose of constructing and selling that building," or (2) "the sale by a corporation of its only major business where the corporation was formed to buy and sell businesses and the proceeds of the sale are to be reinvested in the purchase of a new business...." *See* MODEL BUS. CORP ACT § 12.01 (1999 Supp.) (official cmt.). Decisions from other jurisdictions indicate that corporations sell all or substantially all of their assets in the "usual and regular course" of their business *only* if the corporation's business is to buy and then sell real estate, businesses, or other investments so that it is anticipated that the corporation, at one or more points, will sell all or substantially all of its assets. *See Sutherland v. Kaonohi Ohana, Ltd.,* 776 F.2d 1425, 1427 (9th Cir. 1985) (applying Hawaii law and holding that sale of corporation's only asset—a piece of real estate—was in the ordinary course of the corporation's business because the corporation was formed for the purpose of selling this asset); *Huntsville Indus. Assocs., Inc. v. Cummings,* 292 Ala. 391, 295 So.2d 251, 255 (1974) (stating that sale of all or substantially all of corporation's assets occurs in "usual and regular course of business" when the inherent nature of the corporation's business and the methods used to conduct that business are such that the corporation in the normal course of events sells all or substantially all of its assets and holding that sale in question was not in the usual and regular course of business because the corporation's business was to rent real estate); *Vig v. Deka Realty Corp.,* 143 A.D.2d 185, 186–87, 531 N.Y.S.2d 633 (N.Y.App.Div. 1988) (holding sale of only significant asset was not in usual or regular course of corporation's business because corporation was in the business of managing the real-estate asset in question not in the business of selling it).

In 1987, the Texas Legislature enacted a unique definition of "usual and regular course of business" that is not used in any other state. The only other jurisdiction with similar language in its corporate code is Louisiana, although Louisiana does not use the concept of "usual and regular course of business" in determining whether shareholders' approval is required or whether the appraisal remedy is available. *See* LA. REV STAT. ANN. § 121(E). In estab-

lishing this unusual statutory definition in article 5.09(B), the Texas Legislature may not have intended "usual and regular course of business" to have the common-law meaning that has been adopted by courts under the Model Act; nonetheless, it is appropriate for this court, in construing the meaning of the words, to consider the structure of the Texas Business Corporation Act and similar statutes at the time the Legislature enacted article 5.09(B). *See Helena Chem. Co.*, 47 S.W.3d at 493; *Bass*, 99 S.W.3d at 885 n. 4. A review of these contrasting statutes suggests the Texas Legislature intended a major departure in the definition of "usual and regular course of business."

### 3. *Legislative History*

As part of its analysis of the legislative history, the majority relies on statements made about article 5.09(B) in 1996 by a committee of the State Bar of Texas.[5] Though this learned committee may have been studying the Texas Business Corporation Act and making recommendations concerning it, the Texas Legislature did not change article 5.09(B) based on anything this committee did in 1996. There is no indication that this committee had the same membership as the committee that proposed the addition of article 5.09(B) in 1987. The statements on which the majority relies were not made by legislators, and they were made nearly a decade after the enactment of article 5.09(B). Therefore, these statements, which the majority calls "the 1996 comment to article 5.09," are neither legislative history nor relevant to the statutory-construction issue at hand. *See Chair King, Inc. v. GTE Mobilnet of Houston, Inc.*, 135 S.W.3d 365, 380 (Tex. App.-Houston [14th Dist.] 2004, pet. filed) (holding post-enactment statements by

nonlegislators are irrelevant to interpretation of ambiguous statute); *see also Sullivan v. Finkelstein*, 496 U.S. 617, 631, 110 S.Ct. 2658, 2667, 110 L.Ed.2d 563 (1990) (Scalia, J., concurring in part) (stating that "post-enactment legislative history" is an oxymoron and should not be considered in interpreting statutes and that even the proponents of its use limit it to statements from members of the legislative body that enacted the statute). Similarly, statements made by two of the members of the 1987 State Bar of Texas committee in an article published after the enactment of article 5.09(B) are not relevant legislative history, although the majority cites this article as additional support for its position.[6]

The majority, however, properly considers the Bill Analysis from the House Committee on Business and Commerce. This analysis states that article 5.09(B) contains language similar to section 121(E) of the Louisiana Revised Statutes in an attempt to respond to cases in other jurisdictions that have interpreted a sale of "all or substantially all" of a corporation's assets too broadly. This legislative history states that "shareholder approval is not required if a corporation engages in a business or applies any assets received from a sale in the business of the corporation." *See* HOUSE COMM. ON BUS. & COMM, BILL ANALYSIS, Tex. H.B. 418, 70th Leg., R.S. (1987). Though this legislative history can be read as favoring Arnold White & Durkee's position, it does not specifically address whether the business engaged in after the asset sale can be a completely different one or has to be one of the businesses conducted before the transaction. Therefore, as to the issue in this case, the legislative history is not particularly clear, though it does

---

5. *See* maj. op., *ante* at pp. 560–61.

6. *See* maj. op, *ante* at n. 5, p. 560.

seem to support Arnold White & Durkee's position.

### 4. The Consequences of the Possible Constructions and Legislative Intent

In considering the potential consequences of the possible constructions, it is significant that the Shareholders' construction of the statute would serve the goal stated in the legislative history of avoiding an overly broad view of which asset-sale transactions trigger the statutory protections. If construed as requiring that the corporation continue in one of its prior businesses, article 5.09(B) would still prevent shareholder approval and the appraisal remedy from applying to many corporate transactions that otherwise might arguably require shareholder approval because the assets sold were crucial assets or an important business of the corporation.

Conversely, Arnold White & Durkee's construction of article 5.09(B) would effectively eviscerate the appraisal remedy and shareholder-approval protections for shareholders of Texas corporations, providing the sale of assets was structured in a certain way. See TEX. BUS. CORP. ACT art. 5.10–5.13. Arguably, all the board of directors of a corporation would have to do to avoid these statutory shareholder protections is to arrange for the corporation to continue in some business—even though very different from the corporation's prior businesses—so that the corporation can "engage in a business" after the sale of all or substantially all of the corporation's assets. Given the relative ease of structuring a transaction in this manner, a corporation in Arnold White & Durkee's position could avoid triggering the statutory shareholder protections, leaving minority shareholders vulnerable to fundamental corporate change without shareholder approval

or an appraisal remedy for dissenting shareholders. Though this construction of article 5.09(B) would not completely eliminate the statutory protections available to shareholders, it would seriously limit the circumstances in which they would apply.

While we presume the Legislature, in enacting article 5.09(B), intended a just, fair, and reasonable result, our overriding goal in construing this statute is to give effect to the Legislature's intent. See City of San Antonio, 111 S.W.3d at 25 (stating that, in construing a statute, a court's objective is to give effect to the Legislature's intent); Young v. Del Mar Homes, 608 S.W.2d 804, 807 (Tex.Civ.App.-Houston [14th Dist.] 1980, writ ref'd n.r.e.) (stating courts should not adopt a statutory construction that is based on a presumption that the Texas Legislature intended an unfair, unjust, or unreasonable result). Despite the history and structure of the Texas Business Corporation Act, the legislative history indicates the Legislature intended to adopt a much broader definition of "usual and regular course of business"—one that is far more expansive than the counterpart in the Model Act and that is unlike any definition recognized in Texas case law. Further, article 5.09(B) does not unequivocally require that the corporation continue forward in at least one business it conducted pre-sale, and the second part of article 5.09(B) indicates just the opposite. See TEX. BUS. CORP. ACT art. 5.09(B). Having considered article 5.09(B)'s language, individually and in the context of the entire provision, together with the statutory framework of the Texas Business Corporation Act, the purposes of the appraisal remedy and shareholder-approval requirement regarding sales of all or substantially all of a corporation's assets, the legislative history, and the consequences that would follow from the possible constructions of article 5.09(B), this statute should be construed as requiring that the corporation

continue in some business after the asset sale, without regard to whether the corporation engaged in that business before the asset sale.

Arnold White & Durkee continued to engage in business after the asset sale and so that sale is deemed to be in the "usual and regular course" of the corporation's business under the Legislature's unique definition of that term in article 5.09(B). Because shareholder approval is not required for such a transaction, the consequences of this statutory construction may seem like a harsh treatment of the Shareholders, who did not approve of such a fundamental corporate change in their law firm. This result, however, is compelled by the unusual definition in this statute, unique to Texas law.

In enacting article 5.09(B), the Texas Legislature made a decision to severely limit the statutory protections afforded shareholders and to greatly diminish the rights and remedies available to them under former law. Because the statute affords corporations enormous latitude in making fundamental corporate changes without shareholder approval, the consequences may seem unfair or unjust to dissenting shareholders. But it is the Legislature's prerogative to make these policy choices. This construction of article 5.09(B) simply reflects the Legislature's intent.

### Is it necessary to determine whether Arnold White & Durkee continued in the legal services business?

The majority finds that Arnold White & Durkee continued in the legal services business that it conducted pre-sale. This issue is certainly subject to debate. Arnold White & Durkee used to be a law firm. Its only business was the practice of law and its only purpose was to perform legal services on behalf of clients. It is no longer engaged in the practice of law,[7] and it no longer has—or even seeks—clients.[8] Arnold White & Durkee is merely an interest holder in a new entity that engages in the practice of law. Whether obtaining

---

7. Arnold White & Durkee's remaining attorneys (shareholders and employees) no longer practice law under the auspices of Arnold White & Durkee, but instead hold themselves out as lawyers in Howrey Simon. Since the effective date of the combination, Arnold White & Durkee has been nothing more than a passive partner in Howrey Simon. Moreover, there will never be new shareholders in Arnold White & Durkee, and as existing shareholders retire, withdraw, or otherwise terminate their relationship, Arnold White & Durkee's partnership interest in Howrey Simon is reduced by the same percentage as the departing shareholder's equity interest in Arnold White & Durkee. Eventually, Arnold White & Durkee's partnership interest in Howrey Simon will evanesce altogether. Arnold White & Durkee currently has no source of income other than what it receives as a Howrey Simon partner.

8. Arnold White & Durkee does not market itself as a law firm or carry malpractice insur-

ance. Its few remaining shareholders' practice solely on behalf of Howrey Simon and Howrey Simon clients. The majority finds that Arnold White & Durkee needs no more than lawyers themselves to engage in the legal-services business. The record shows that when Arnold White & Durkee had clients, the firm used a great deal more than lawyers to engage in the legal-services business, including leasehold interests, books, computers, furniture, equipment, and many other operating assets. Though it may be technically possible to engage in the legal-services business with no operating assets, as the majority suggests, Arnold White & Durkee clearly did not do so before the asset transfer, when the firm still had clients. With no "tools of the trade" it would seem that the firm's few remaining lawyers and support staff would be ill-equipped to service clients even if there were some. Likewise, with no clients to consume legal services, it is questionable whether Arnold White & Durkee could, directly or indirectly, continue in the legal-services business.

and holding a partnership interest such as that held by Arnold White & Durkee in the newly created firm of Howrey Simon Arnold & White, L.L.P. constitutes "directly or indirectly engaging in the legal services business," as the majority concludes, is an interesting issue but one that this court need not reach.[9]

### CONCLUSION

The Texas Legislature has adopted a peculiar definition of "usual and regular course of business" in article 5.09(B) not utilized in any other jurisdiction or recognized at common law. Under this unique definition, a corporation's sale of all or substantially all of its assets is in the "usual and regular course of business" as long as the corporation continues in business—any business—after the sale. Arnold White & Durkee continued in business after the sale. Accordingly, the trial court did not err in granting summary judgment based on Arnold White & Durkee's assertion that the asset sale was in the usual and regular course of its business under article 5.09(B), and therefore, shareholder approval of the transaction was not required. Moreover, because the statutory shareholder protections in articles 5.10 and 5.12 were never triggered, the Shareholders have no appraisal remedy.

---

9. In some parts of its opinion, the majority also indicates that the applicable legal standard requires an inquiry into whether Arnold White & Durkee continued to exist as a corporation or is still a viable corporation after the sale. Although corporate existence is required to conduct business, corporate existence, by itself, is not sufficient to constitute doing business. In any event, the applicable statute does not require this court to determine whether Arnold White & Durkee continued to exist as a corporation or is still a viable corporation after the sale. We are to determine whether it continued in business after the sale.